# 25-1104-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

KEITH MASSIMINO,

*Plaintiff-Appellant,*

— v. —

MATTHEW BENOIT and FRANK LAONE,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT, NEW HAVEN

---

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

---

DAN BARRETT
ELANA BILDNER
JACLYN BLICKLEY
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF CONNECTICUT
*Attorneys for Plaintiff-Appellant*
P.O. Box #320647
Hartford, Connecticut 06132
(860) 471-8471

# Table of Contents

**Page**

Table of Authorities ........................................................................ iv

Subject Matter and Appellate Jurisdiction .....................................1

Issues Presented ............................................................................ 2

Preliminary Statement .................................................................. 3

Statement of the Case.................................................................... 5

    Mr. Massimino records the exterior of the station from the
    public sidewalk................................................................ 6

    Mr. Massimino records for around six and a half minutes
    before being stopped and seized by the defendants.......................7

    Mr. Massimino is arrested by the defendants, a case is
    brought against him in Superior Court, and after nearly
    three years, the single charge is dismissed ...................................10

Procedural History ...................................................................... 11

Summary of Argument.................................................................14

Standard of Review......................................................................20

Argument.....................................................................................21

1.    Having stopped Mr. Massimino from videorecording on a
    sidewalk in violation of the First Amendment and in the
    face of that right's clear establishment, the appellees are
    liable on Count One......................................................................21

    1.1.    The appellees violated Mr. Massimino's right to
        free speech when they stopped him from
        videorecording the exterior of the police station
        from the sidewalk............................................................ 22

    1.2.    The obviousness of the proposition, and express
        rulings from six other circuits, clearly established
        by October 2018 that Mr. Massimino had a right
        to videorecord the exterior of the police station
        from the sidewalk............................................................ 24

i

1.2.1.      The right at issue is Mr. Massimino's ability to record the exterior of the police station from the sidewalk ................................. 25

1.2.2.      Statutory law and the plain view doctrine made it obvious to every Connecticut police officer that anyone is permitted to observe what is visible in public........................ 27

1.2.3.      By October 2018, Mr. Massimino's right to record was clearly foreshadowed by six other circuits' rulings establishing the right for qualified immunity purposes ...............31

2.      Because they seized Mr. Massimino based on nothing more than his being 'just on the corner filming,' the appellees violated his Fourth Amendment rights and are not qualifiedly immune ...................................................... 39

2.1.      The appellees seized Mr. Massimino when they flanked him and demanded his identification ................ 39

2.2.      At the moment they seized him, the appellees needed reasonable articulable suspicion to believe that Mr. Massimino was committing a crime ................ 43

2.2.1.      When the appellees seized him, Mr. Massimino was not engaging in any activity remotely suggesting criminality ........... 45

2.2.2.      Neither the appellees' in-the-moment justification, nor their pretextual rationale, saves them from summary judgment........................................................... 48

2.2.2.1.      From their own mouths, the appellees' rationale for seizing Mr. Massimino was that recording police stations is "not allowed." ............................................. 49

2.2.2.2. The appellees' pretextual demand that Mr. Massimino disprove their assumption that he was up to no good contravenes the meaning of "reasonable articulable suspicion." ........................................... 52

2.2.3. The Fifth Circuit holding relied on by the district court contains no analysis and is unpersuasive ..................................................... 56

2.3. The appellees are not entitled to qualified immunity................................................................. 59

3. Connecticut's interference charge does not apply to ID declinations during extra-legal seizures, and so the appellees necessarily lacked probable cause to arrest, and commence a prosecution, for it........................................................ 61

Conclusion ................................................................................. 65

# Table of Authorities

**Page(s)**

**Cases:**

*ACLU of Illinois v. Alvarez,*
    679 F.3d 583 (7th Cir. 2012) .......................................................... 33, 37

*Askins v. U.S. Dep't of Homeland Sec.,*
    899 F.3d 1035 (9th Cir. 2018) ...................................................31-32, 36

*Bhatia v. Debek,*
    948 A.2d 1009 (Conn. 2008) ...................................................... 62

*Brown v. City of Oneonta, N.Y.,*
    221 F.3d 329 (2d Cir. 2000).......................................................41

*Brown v. Texas,*
    443 U.S. 47 (1979) ........................................................ 42, 43, 63

*Chestnut v. Wallace,*
    947 F.3d 1085 (8th Cir. 2020) ................................................60

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010).......................................................... 22

*Cornelio v. Connecticut,*
    32 F.4th 160 (2d Cir. 2022).......................................................... 62

*Cotto v. City of Middletown,*
    158 F.Supp.3d 67 (D. Conn. 2016) ..........................................61

*Cox Broad. Corp. v. Cohn,*
    420 U.S. 469 (1975)........................................................ 23

*Dancy v. McGinley,*
    843 F.3d 93 (2d Cir. 2016).....................................39, 41, 45, 59

*Fields v. City of Philadelphia,*
    862 F.3d 353 (3d Cir. 2017) .........................................33, 37, 57

*Florida v. Bostick,*
    501 U.S. 429 (1991)..........................................................40, 42

*Florida v. Rodriguez,*
    469 U.S. 1 (1984) ........................................................ 45

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) ............................................................. 32, 34

*Francis v. Fiacco*,
  942 F.3d 126 (2d Cir. 2019) ...................................................... 22

*Friend v. Gasparino*,
  61 F.4th 77 (2d Cir. 2023) ......................................... 35, 63, 64

*Galloway v. County of Nassau*,
  141 F.4th 417 (2d Cir. 2025) ................................................ 24

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011)................................................ *passim*

*Hartline v. Gallo*,
  546 F.3d 95 (2d Cir. 2008) .................................................... 60

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ........................................................... 23

*Irizarry v. Yehia*,
  38 F.4th 1282 (10th Cir. 2022) ...................................... 34, 36, 37

*Jones v. Clark*,
  630 F.3d 677 (7th Cir. 2011)............................................... 50

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ...................................................... 22

*K. H. Through Murphy v. Morgan*,
  914 F.2d 846 (7th Cir. 1990) ............................................... 27

*Katz v. United States*,
  389 U.S. 347 (1967) ........................................................ 29

*Linton v. Zorn*,
  135 F.4th 19 (2d Cir. 2025) ........................................ 24, 25, 36

*Martin v. City of Struthers, Ohio*,
  319 U.S. 141 (1943) ..................................................... 23

*Mglej v. Gardner*,
  974 F.3d 1151 (10th Cir. 2020) ............................................. 50

*Michigan v. Chesternut*,
  486 U.S. 567 (1988)........................................................ 49

*Molina v. City of St. Louis,*
   59 F.4th 334 (8th Cir. 2023) ....................................... 34

*Nat'l Rifle Ass'n of Am. v. Vullo,*
   No. 21-636-CV, ___ F.4th ___, 2025 WL 1966596
   (2d Cir. July 17, 2025) .............................................. 24

*Oklahoma Pub. Co. v. Dist. Ct.,*
   430 U.S. 308 (1977) ................................................. 23

*Olson v. Major League Baseball,*
   29 F.4th 59 (2d Cir. 2022) ......................................... 31

*Ozga v. Elliot,*
   150 F.Supp.3d 178 (D. Conn. 2015) ........................... 42

*Palmer v. Richards,*
   364 F.3d 60 (2d Cir. 2004) ......................................... 21

*Payton v. New York,*
   445 U.S. 573 (1980) ................................................. 28

*Rupp v. Buffalo,*
   91 F.4th 623 (2d Cir. 2024) ....................................... 64

*Salmon v. Blesser,*
   802 F.3d 249 (2d Cir. 2015) ....................................... 40

*Sharpe v. Winterville Police Dep't,*
   59 F.4th 674 (4th Cir. 2023) ...................................... 34

*Simon v. City of New York,*
   893 F.3d 83 (2d Cir. 2018) ......................................... 27

*Smith v. City of Cumming,*
   212 F.3d 1332 (11th Cir. 2000) ............................. 32, 34

*Soukaneh v. Andrzejewski,*
   112 F.4th 107 (2d Cir. 2024) ............................ 35-36, 62

*State v. Aloi,*
   911 A.2d 1086 (Conn. 2007) ................................ 63, 64

*State v. Brown,*
   903 A.2d 169 (Conn. 2006) ...................................... 29

*Suluki v. Credit One Bank, NA,*
   138 F.4th 709 (2d Cir. 2025) ..................................... 20

vi

*Superior Films, Inc. v.*
  *Dep't of Educ. of State of Ohio, Div. of Film Censorship*,
  346 U.S. 587 (1954) ................................................................. 22

*Tanvir v. Tanzin*,
  894 F.3d 449 (2d Cir. 2018) ..................................................... 65

*Terebesi v. Torreso*,
  764 F. 3d 217 (2d Cir. 2014) ..................................................... 24

*Terry v. Ohio*,
  392 U.S. 1 (1968) ............................................................. *passim*

*The Fla. Star v. B. J. F.*,
  491 U.S. 524 (1989) ................................................................. 23

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ............................................... *passim*

*United States v. Bayless*,
  201 F.3d 116 (2d Cir. 2000) ..................................................... 45

*United States v. Dorlette*,
  706 F.Supp.2d 290 (D. Conn. 2010) ......................................... 54

*United States v. Fields*,
  113 F.3d 313 (2d Cir. 1997) ........................................... 28, 34, 57

*United States v. Freeman*,
  735 F.3d 92 (2d Cir. 2013) ........................................... 44, 50, 55

*United States v. Gomez*,
  633 F.2d 999 (2d Cir. 1980) ................................................. 41-42

*United States v. Gonzalez*,
  No. 08 CR. 363, 2009 WL 613201 (S.D.N.Y. Mar. 4, 2009), *aff'd*,
  441 F.App'x 31 (2d Cir. 2011), *aff'd*, 470 F.App'x 2 (2d Cir. 2012) ........... 45

*United States v. Gori*,
  230 F.3d 44 (2d Cir. 2000) ....................................................... 41

*United States v. Hagood*,
  78 F.4th 570 (2d Cir. 2023) ..................................................... 53

*United States v. Harry*,
  130 F.4th 342 (2d Cir. 2025) ................................................... 28

*United States v. Henderson,*
    463 F.3d 27 (1st Cir. 2006) ....................................................... 50

*United States v. Lee,*
    916 F.2d 814 (2d Cir. 1990) ................................................ 40, 41

*United States v. Lifshitz,*
    369 F.3d 173 (2d Cir. 2004) ...................................................... 43

*United States v. Mendenhall,*
    446 U.S. 544 (1980) .................................................................. 40

*United States v. Muhammad,*
    463 F.3d 115 (2d Cir. 2006) ............................................... 46, 47

*United States v. Padilla,*
    548 F.3d 179 (2d Cir. 2008) ............................................... 46, 47

*United States v. Reyes,*
    821 F.2d 168 (2d Cir. 1987) ...................................................... 46

*United States v. Santillan,*
    902 F.3d 49 (2d Cir. 2018) ................................................. 45, 53

*United States v. Simmons,*
    560 F.3d 98 (2d Cir. 2009) ........................................................ 55

*United States v. Singletary,*
    798 F.3d 55 (2d Cir. 2015) .......................................... 44, 48, 58

*United States v. Slocumb,*
    804 F.3d 677 (4th Cir. 2015) .................................................... 53

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................. 35

*United States v. Ubiles,*
    224 F.3d 213 (3d Cir. 2000) ................................................ 50-51

*United States v. Villegas,*
    928 F.2d 512 (2d Cir. 1991) ...................................................... 45

*United States v. Walker,*
    965 F.3d 180 (2d Cir. 2020) ......................................... 43, 47, 49

*United States v. Watson,*
    423 U.S. 411 (1976) .................................................................. 28

*United States v. Williams,*
  615 F.3d 657 (6th Cir. 2010) ...................................................... 50

*Vasquez v. Maloney,*
  990 F.3d 232 (2d Cir. 2021) .......................................... 44, 50, 59

*Vega v. Semple,*
  963 F.3d 259 (2d Cir. 2020) ...................................................... 27

*W. Watersheds Project v. Michael,*
  869 F.3d 1189 (10th Cir. 2017) ............................................ 34, 36

*Zenik v. O'Brien,*
  79 A.2d 769 (Conn. 1951) ......................................................... 62

**Statutes & Other Authorities:**

U.S. Const. Amend. 1 ............................................................ *passim*

U.S. Const. Amend. 4 ............................................................ *passim*

28 U.S.C. § 1291 .......................................................................... 1

Fed. R. Civ. P. 56(c)(1) ............................................................ 37

Conn. Gen. Stat. § 53a-167a ................................................ *passim*

Conn. Gen. Stat. § 53a-167a(a) .............................................. 64

Conn. Gen. Stat. § 53a-187(a)(2) ........................................... 28

Conn. Gen. Stat. § 53a-189a ................................................... 28

Conn. R. Super. Ct. § 38-13 .................................................... 11

## Subject Matter and Appellate Jurisdiction

This Court has jurisdiction over "appeals from all final decisions of the district courts of the United States" located within the Second Circuit. 28 U.S.C. § 1291. The District of Connecticut's decision on the parties' cross-motions for summary judgment issued on March 31, 2025, and Mr. Massimino timely appealed on April 28, 2025.

## Issues Presented

1. Whether police violate the First Amendment's Speech Clause by stopping a person from videorecording the plainly visible exterior of a police station from the sidewalk.

2. Whether police unlawfully seize a person to demand identification when their suspicion is solely based on the person's videorecording on a sidewalk.

3. Whether probable cause for the Connecticut police interference offense can arise during an unlawful seizure.

## Preliminary Statement

On an October evening in 2018, Keith Massimino walked the sidewalks bounding two sides of the Waterbury, Connecticut police station. The building's exterior was unobscured by fencing or shrubs, visible to all who passed by on the sidewalk or busy city streets. A videographer by trade and a First Amendment auditing hobbyist, Mr. Massimino decided to videorecord the exterior in the hopes of receiving no reaction whatsoever from the police: a 'clean audit.' For about six and a half minutes, Mr. Massimino filmed in peace from the sidewalk, which he never left.

But then two police employees approached to interrupt his filming, stood on either side of him in close proximity, and told Mr. Massimino one after the other that they "need[ed] ID" from him. Although no state or federal law said so, and six circuits had by then expressly found a First Amendment right to record the police in public, the police told Mr. Massimino that filming police stations was "not allowed." Mr. Massimino spoke with them directly and politely. He asked them, on video, what crime they believed he was committing, to which each simply responded "reasonable suspicion." The police asked Mr. Massimino to convince them that he was "not planning on blowing up" the police station, even though they admitted at deposition that they did not suspect he was armed and did

not suspect he would use force. When Mr. Massimino asked them why he needed to identify himself when he was committing no crime, the police told him that their demand was an order. After he politely declined, the police arrested him for interference and caused Mr. Massimino to be subject to bail conditions for three years until the Connecticut Superior Court dismissed the criminal charge.

Mr. Massimino brought suit in the District of Connecticut against the two police, contending that they violated (1) his First Amendment right to speech, (2) his Fourth Amendment right against unreasonable seizure, and (3) his Fourth Amendment right against malicious prosecution. On cross-motions for summary judgment, the district court granted the defendants judgment on all counts, concluding in relevant part that the defendants were qualifiedly immune from the First Amendment violation and that videorecording a police station created sufficient suspicion to detain Mr. Massimino.

The undisputed fact record requires that this Court reverse and remand with instructions for judgment to enter for Mr. Massimino on Counts One and Two, and, for the district court to decide the qualified immunity defense as to Count Three.

## Statement of the Case

Keith Massimino is a professional videographer with a hobby in First Amendment auditing, a genre in which a person records in a public place where it is lawful to do so. A successful audit is one in which the videographer films without incident, reaction, or restriction. JA121.

On October 30, 2018, Mr. Massimino drove through Waterbury, Connecticut on his way home from a job. JA288, JA442. Heavy traffic on Interstate 84 led him to try waiting it out a bit while filming the exterior of the Waterbury police station. JA288, JA442.

The police station is located at 255 East Main Street in Waterbury. JA287, JA442. It is a large building, surrounded by public sidewalks, that occupies an entire block. *Id.* The main entrance faces East Main Street, the two sides face North Elm and Maple Streets, and the rear of the building faces Water Street. *Id.* On the evening of October 30, 2018, there were no fences, shrubs, or any other obstructions impeding the public's ability to see the entirety of the exterior of the building. *Id.* There were also no signs posted on the exterior of the building forbidding recording. JA288, JA442.

**Mr. Massimino records the exterior of the station from the public sidewalk.**

Mr. Massimino parked his car about a half mile from the building and walked from there with a digital camera and a tripod. *Id.* He left the rest of the video equipment he had used at the job in his car, along with his wallet. JA288-JA443.

With the camera on, Mr. Massimino walked the sidewalk and filmed the exterior of the building. *See generally* JA383 (video); JA295, JA445 (admitting authenticity of video). He started in front of the station, walking down the sidewalk on East Main Street. JA383 at 00:30-01:49. Mr. Massimino reached the corner of East Main and North Elm Street, turned and walked down the sidewalk on North Elm Street. *Id.* at 01:49, 02:08-04:19. Where North Elm intersects Water Street toward the back of the station, Mr. Massimino recorded the police station's open-sided parking garage and its exit onto North Elm Street. *Id.* at 02:38-03:50. Mr. Massimino recorded up and down North Elm Street before heading back toward the front of the building on East Main Street. *Id.* at 03:52-04:27.

In the process of recording, Mr. Massimino captured a surveillance camera mounted on the exterior of the building at the corner of East Main and North Elm Streets, visible from the sidewalk. *Id.* at 01:59-02:03. Mr. Massimino also took video footage of the garage and its open entrance/exit

gate. *Id.* at 02:48-03:50. The interior of the garage was plainly visible from the sidewalk, and Mr. Massimino never entered it. *Id.*

While walking up and down North Elm Street, Mr. Massimino passed and recorded the entrance to the police department's youth division. *Id.* at 02:23-02:33. The entrance to the youth division was visible from the sidewalk and was clearly marked with the words "Waterbury Police Department Youth Division.*" Id.*. At the time of recording, the interior of the youth division was dark and no one came in or out. *Id.*

At all times while filming, Mr. Massimino remained on the public sidewalk, JA288, JA443, and every image that he recorded was something that could be readily viewed by people passing by, including the building's front entrance, the garage, and the entrance to the Youth Division.

### Mr. Massimino records for around six and a half minutes before being stopped and seized by the defendants.

Appellee Matthew Benoit saw Mr. Massimino on North Elm Street when Mr. Benoit happened to look out the window of the station. JA290, JA443. Mr. Benoit told his co-appellee Frank Laone about Mr. Massimino, then "drove around the building a couple of times" to see what Mr. Massimino was doing. *Id.* Mr. Laone used the surveillance cameras on the

station's exterior to watch Mr. Massimino standing on the sidewalk, videorecording. *Id.*

After Mr. Massimino had been filming for about six and a half minutes, Messrs. Benoit and Laone approached him. JA383 at 06:39. They did not suspect that Mr. Massimino was armed; he was, in Mr. Laone's words, "just on the corner filming." JA168 at 24. The audio of the parties' ensuing conversation was captured by Mr. Massimino's camera, which was mainly trained on the sidewalk. JA383 at 6:39-10:56.

Mr. Massimino was standing near the main entrance to the police station on the North Elm Street sidewalk when Messrs. Laone and Benoit approached him. JA383 at 06:39. Both were in uniform. JA383 at 06:39. They stood extremely close to Mr. Massimino, one on either side. *Id.* at 06:55-7:00. Mr. Laone began the interaction by asking Mr. Massimino what he was "taping." *Id.* at 06:40.[1] Mr. Massimino told the pair that he was "getting footage" and "just getting content for a story." *Id.* at 06:41-06:48. Mr. Laone asked, "what kind of story," and Mr. Massimino declined to say, as he was still working on it. *Id.* at 06:50-06:54.

---

[1] The sidewalk conversation was not in the orderly setting of a deposition, so the parties spoke over or interrupted one another. In that setting, timestamps referring to specific statements are necessarily a bit imprecise.

Mr. Laone then changed topics from what Massimino was doing, to who he was, asking Mr. Massimino, "You got ID on you?" *Id.* at 06:59-07:01. Mr. Benoit immediately interjected to demand that Mr. Massimino produce ID, stating, "We need ID." *Id.* at 07:01. Mr. Laone echoed this demand verbatim. *Id.* at 07:02.

Mr. Massimino asked why he needed to identify himself given that he was engaged in First Amendment-protected activity. *Id.* at 07:03-07:05. Mr. Benoit claimed that Mr. Massimino presented "a security issue" because he was "videotaping a police station." *Id.* at 07:05-07:09. Mr. Laone then asked— while chuckling –"how do we know you're not planning on blowing up the building." *Id.* at 07:20-07:23. Mr. Massimino answered truthfully that he had no ill will. *Id.* at 07:24-07:26. However, Mr. Benoit further insisted that "we don't know that," despite having no facts suggesting otherwise. *Id.* at 07:26-07:27. Mr. Laone then further stated that the demand that Mr. Massimino identify himself was "a lawful order." *Id.* at 07:34-07:37.

The appellees continued the interaction, with Mr. Benoit repeating several times that Mr. Massimino was "not allowed to videotape a police station," without identifying any statute to corroborate that. *Id.* at 08:10-08:18. Mr. Laone agreed with Mr. Benoit's assertions that it was illegal to

9

videorecord a police station. *Id.* at 08:19-08:21. When Mr. Massimino asked the defendants to "articulate a crime [he] committed," Mr. Laone stated simply, "reasonable suspicion." *Id.* at 08:26-08:28. Mr. Laone went on to assert that Mr. Massimino was "videotaping secure areas of the police station." *Id.* at 08:35-08:36. Mr. Laone did not specify which areas he believed to be "secure." Mr. Laone confirmed that Mr. Massimino was not free to leave, and when asked again what crime Mr. Massimino had committed, once more named the offense as "reasonable suspicion." *Id.* at 08:44-08:47.

### Mr. Massimino is arrested by the defendants, a case is brought against him in Superior Court, and after nearly three years, the single charge is dismissed.

After again demanding identification, Mr. Benoit ordered Mr. Massimino to put his hands behind his back for arrest. *Id.* at 08:56-08:58. He charged Mr. Massimino with violating Connecticut's police interference statute, Conn. Gen. Stat. § 53a-167a. JA295, JA445. Both appellees admitted that they did not have probable cause for any other charge. JA188-JA189, JA248.

Shortly thereafter, Mr. Laone set Mr. Massimino's bail at $10,000. JA295, JA445. Unable to produce that amount, Mr. Massimino was held

until 10:00 p.m., when a state judicial employee known as a bail commissioner did away with the $10,000 condition and instead set Mr. Massimino's conditions of release as (1) appearance at all future court dates, and (2) not "commit[ting] a federal, state, or local crime" during the pendency of the case. JA295-JA296, JA445.

The charge Mr. Benoit laid automatically initiated a criminal prosecution in the Connecticut Superior Court. JA296, JA445. Although the superior court possessed the authority to modify the bail conditions, Conn. R. Super. Ct. § 38-13, it did not, and so Mr. Massimino was bound by them until the criminal case ended. JA296, JA445. The superior court held at least twenty hearings in the criminal case; Mr. Massimino retained two criminal defense lawyers, JA297, JA446, and attended all but a few of the hearings. JA297, JA446. Almost three years later, on May 21, 2021, the superior court dismissed the lone charge against Mr. Massimino. JA297, JA446.

## Procedural History

Mr. Massimino filed suit in the District of Connecticut in August 2021. JA8-JA15. The complaint pleaded three counts: a violation of Mr. Massimino's right to free speech for stopping him from viewing and memorializing buildings in plain view from the sidewalk (Count One); the

violation of the Fourth Amendment for his seizure and arrest (Count Two); and the violation of his Fourth Amendment right against malicious prosecution for initiating a criminal prosecution against him absent probable cause (Count Three). *Id.*

Discovery revealed no factual squabbles, perhaps because the parties' entire interaction is on video. The parties cross-moved for summary judgment in June 2022, JA16, JA298, agreeing that there were no disputes of material fact, JA24, JA341. On March 31, 2025, the district court denied Mr. Massimino's motion and granted the defendants' motion. JA447.

As to Count One, the district court concluded that the appellees were entitled to qualified immunity. In making that determination, the district court improperly characterized the right at issue as the "right to videotape sensitive, nonpublic areas of a police station," and concluded that the lack of case law involving recording *buildings* meant that the right was not clearly established. JA451-JA452.

On Count Two, the district court found that the detention was supported by reasonable suspicion that "criminal activity was afoot" based on Mr. Massimino's "unusual behavior" and in light of unspecified and speculative "prior attacks on other police stations." JA454-JA455. The court found the appellees entitled to qualified immunity on this count as

well, holding that there was no authority that would lead a "reasonable officer" to believe that "briefly detaining the plaintiff for further investigation did not violate the fourth amendment." JA456.

As to the arrest, the court concluded that the appellees had probable cause to arrest Mr. Massimino based on his refusal to provide identification. JA458-JA459. The court additionally held that even if the appellees lacked probable cause, they were qualifiedly immune for having had arguable probable cause for the arrest. JA459.

The district court addressed Count Three in one sentence, holding only that the record "[did] not permit a reasonable finding that Benoit violated the plaintiff's rights under the Fourth Amendment." JA460. It did not address qualified immunity.

Mr. Massimino appealed.

## Summary of Argument

1.      The appellees are not qualifiedly immune from liability for preventing Mr. Massimino from videorecording in public because the First Amendment protects all phases and media of speech-generation, and, the right was obvious by October 2018.

First, there can be no serious dispute that Mr. Massimino's act of recording a video receives First Amendment protection, and that the appellees violated that right when they stopped him from doing so. The Speech Clause applies with equal force to all types of media without the need for case law to follow suit. For purposes of the First Amendment, Mr. Massimino's video-making was indistinguishable from his having described the exterior of the police station orally to a friend by telephone or drawn a picture of it in a pocket sketchbook. The Speech Clause's protections also apply at all steps in the speech-formulation process. The stem-to-stern protections afforded the ability to gather information and create ideas thus forbade the appellees from preventing Mr. Massimino from creating a videorecording with as much force as they would forbid punishing him for exhibiting a videorecording.

The First Amendment also protects information-gathering from any lawful source, which necessarily includes the publicly visible exterior of a

police station. The Waterbury municipal government's decision not to obscure any part of the building Mr. Massimino recorded from the sidewalk also insulated him from later infringement on his speech rights. If Waterbury wished to hide its police station, its recourse was to block the building, not the video.

Mr. Massimino's right to record the exterior of a government building from the sidewalk had been clearly established by October 2018 such that any person on the street would have been rightfully bewildered by a police claim that it was 'not allowed.' The distinction between public and private has concrete daily significance to the appellee police employees, from arrest warrant requirements to state privacy statutes. And, the difference yields the greatest policing shortcut yet imagined, the plain view doctrine. The person who exposes his actions or belongings to the public eye has no defense against the result being used against him, because he has expressed a subjective lack of privacy. The police—and everyone else—are entitled to see and act upon that which is revealed to the public, just as Mr. Massimino was entitled to record the unobscured exterior of the police station.

As importantly, by October 2018, no fewer than six other circuits had clearly established the right to record the police in public, in a drumbeat of

decisions dating back to 2008 and stretching from the First to Ninth Circuits. Each held that the ability to record the police in public is protected by the First Amendment.

The district court's contrary conclusion was based upon a mistake of fact and a mistake of law. Its factual mistake was identifying Mr. Massimino's purported right as one to videorecord 'sensitive,' 'non-public' areas of the police station. But the parties placed the topic beyond dispute in their summary judgment statements of material fact, wherein they agreed that Mr. Massimino stayed in the paramount public venue—a sidewalk—the entire time. The trial court's mistake of law lay in its casting aside six circuit decisions clearly establishing the right to record the police because those decisions do not concern police *stations*. This Court holds that requiring factual identity in the clear-establishment analysis is error. And as a matter of First Amendment orthodoxy, there is no meaningful difference between the ability to film police employees and the ability to film the outside of the building they work in.

2.     Mr. Massimino is entitled to judgment on his Fourth Amendment seizure claim (Count Two). Mr. Massimino had been filming for about six and a half minutes when the uniformed appellees stood close to him, one on either side, in front of the police station's main entrance, and demanded

identification. The coincidence of Benoit and Laone standing in close proximity to him, on either side of him, in uniform, and telling him—not asking, or suggesting—that he was required to furnish identification would be a sufficient show of authority to signal to any person that they were not free to leave.

To stay within the Fourth Amendment's lines, the appellees needed reasonable, articulable suspicion that Mr. Massimino was engaged in crime at this moment of seizure. They had none. In their own words during the seizure, the appellees restrained Mr. Massimino because recording the exterior of police stations is "not allowed." They did not suspect him of being armed, and even years later at deposition could not articulate their suspicion beyond the forbidden refrain that Mr. Massimino "could have been doing anything." That sets this case in glaring contrast to the mine-run reasonable articulable suspicion dispute, in which a suspect perhaps cannot recall his passenger's name, has no explanation for why he is in a town nowhere near his home, discards something, runs away, has a suspicious bulge on his waistline, or any other commonly recited curious circumstance. By contrast, Mr. Massimino's actions did not remotely suggest criminality. He answered questions directly, and declined plainly and without prevarication when he wished not to answer.

The appellees' justifications for the stop fall far short of reasonable articulable suspicion. First, their loudly professed reason for the stop, that recording the exterior of the police station was forbidden, was and is wrong as a matter of law. No state or federal statute forbade Mr. Massimino to peacefully stroll the sidewalk and videorecord what his naked eye could see. Second, this Court's teachings on seizure flatly forbid the conclusion that the appellees require: that a person must disprove all possibilities of criminality, even if the very police demanding the disproval have no idea what would suffice. This is particularly true where, as here, the appellees attempted to use facts they learned after they seized Mr. Massimino to recursively justify their seizure of him.

Lastly as regards the seizure, the district court's reliance on the Fifth Circuit's reasonable articulable suspicion analysis in *Turner v. Driver* to grant the appellees qualified immunity was wrong. The Fifth Circuit's decision on that point was threadbare and unconvincing, concluding on *ipse dixit* that videorecording police stations is inherently suspicious even though Fourth Amendment analysis requires the objective facts of each seizure to be considered. And, the district court's conclusion runs afoul of this Court's teachings, which consistently hold across fact patterns that

police will not be qualifiedly immune for seizures based on nothing more than inchoate hunches.

3.     Finally, Connecticut bars the use of the state police interference statute against identification declinations occurring during unlawful seizures, and so the appellees necessarily lacked probable cause to arrest Mr. Massimino for that (Count Two), and Mr. Benoit lacked probable cause to prosecute him for it (Count Three). Of the four elements of a malicious prosecution claim, the only one in dispute here is probable cause for the charge of Conn. Gen. Stat. § 53a-167a, interference. Connecticut's Supreme Court has directly limited that charge to a lack of cooperation after a *lawful* seizure. No one may be charged with interference for declining to speak with the police—or furnish ID to them—when they are not validly seized based upon reasonable articulable suspicion. Because Mr. Massimino was not, both his arrest and prosecution lacked probable cause.

The unusually clean fact record is devoid of material disputes, and Mr. Massimino has the better of the appellees on the merits of all three counts. This Court should reverse the grant of summary judgment, and remand with instructions that judgment enter in Mr. Massimino's favor on Counts One and Two, and that the district court rule on the appellees' yet-undecided qualified immunity defense on Count Three.

## Standard of Review

A district court's grant of one cross-motion for summary judgment and denial of the other garners *de novo* review. This Court "evaluate[s] each party's motion on its own merits," drawing "all reasonable inferences against the party whose motion is under consideration." *Suluki v. Credit One Bank, NA*, 138 F. 4th 709, 719 (2d Cir. 2025) (cleaned up).

# Argument

**1.** **Having stopped Mr. Massimino from videorecording on a sidewalk in violation of the First Amendment and in the face of that right's clear establishment, the appellees are liable on Count One.**

Count One contends that the appellees violated the First Amendment by cutting short Mr. Massimino's videorecording. The District of Connecticut granted qualified immunity to the appellees on this count because of its factual mistake that "this case involves making a videotape of nonpublic spaces," and because it viewed the absence of recording cases specifically addressing police stations as meaning that Mr. Massimino's right was not clearly established. JA450, JA452. Both are wrong. The appellees admitted that Mr. Massimino never left the sidewalk or entered the building, and the obviousness of his right to record what he could see from the sidewalk was overwhelming. The appellees cannot to meet their burden of proving entitlement to immunity, *e.g.*, *Palmer v. Richards*, 364 F. 3d 60, 67 (2d Cir. 2004), and so judgment on Count One should enter for Mr. Massimino.

21

### 1.1. The appellees violated Mr. Massimino's right to free speech when they stopped him from videorecording the exterior of the police station from the sidewalk.

The first step of the qualified immunity inquiry asks, in relevant part, whether the defendants to a § 1983 count violated a constitutional right. *E.g.*, *Francis v. Fiacco*, 942 F. 3d 126, 139 (2d Cir. 2019). In the litigation below, neither the appellees, nor the district court, contested that Mr. Massimino's videorecording was protected by the First Amendment's Speech Clause, perhaps because the point is obvious.

First, video is speech. The Speech Clause does not vary by medium. It "draws no distinction between the various methods of communicating ideas," and is unwavering despite communications technologies being "transitory—here now and gone in an instant." *Superior Films, Inc. v. Dep't of Educ. of State of Ohio, Div. of Film Censorship*, 346 U.S. 587, 589 (1954) (Douglas, J., concurring in summary striking of film censorship scheme). And so, video stands on equal footing as the written word or painted canvas. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952).

Second, the formulation of speech—such as videorecording—gets the same treatment as speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010) (holding that measures that "control or suppress speech . . . at different points in the speech process" are scrutinized

identically to restrictions on the finished product). The start-to-finish protection for speech includes the right to gather or receive information, *e.g.*, *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943), "from any source by means within the law." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (cleaned up).

And third, any attempt to "hide" the police department by barring Mr. Massimino's recording of it was doomed. Where the government chooses to reveal information to the public, it may not later restrict speech about that information. *Oklahoma Pub. Co. v. Dist. Ct.*, 430 U.S. 308, 311 (1977); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975). The only constitutional manner by which "to forestall or mitigate the injury caused by" the government's own revelation of information is to control its release in the first instance, not to punish post-release uses of the information. *The Fla. Star v. B. J. F.*, 491 U.S. 524, 534 (1989). If Waterbury wanted to obscure the exterior of its police department, it had to do that at the outset—with a privacy fence, secret location, or some such action—rather than try to prevent Mr. Massimino's videorecording in 2018.

The confluence of those three tenets—medium agnosticism, protection for all phases of the speech process, and no downstream restrictions for information revealed by the government itself—yields the

23

First Amendment violation pleaded in Count One of Mr. Massimino's complaint. The appellees violated his right to free speech when they cut short his videorecording of the exterior of the police station.

> ### 1.2. The obviousness of the proposition, and express rulings from six other circuits, clearly established by October 2018 that Mr. Massimino had a right to videorecord the exterior of the police station from the sidewalk.

The second step in the qualified immunity analysis queries whether a right was clearly established on the date that the defendant violated it. To determine whether Mr. Laone and Mr. Benoit should have known that stopping Mr. Massimino's videorecording violated the First Amendment, this Court consults appellate caselaw "as it existed at the time of" their conduct," *Galloway v. County of Nassau*, 141 F.4th 417, 423 (2d Cir. 2025). Where this Court—or the one above it—has not ruled on the question, a right can be clearly established by the "robust consensus of cases of persuasive authority," *Nat'l Rifle Ass'n of Am. v. Vullo*, No. 21-636-CV, ___ F. 4th ___, 2025 WL 1966596, at *9 (2d Cir. July 17, 2025) (cleaned up), including decisions of other circuits "clearly foreshadow[ing]" a ruling from this one. *Terebesi v. Torreso*, 764 F. 3d 217, 231 (2d Cir. 2014) (cleaned up). Any type of ruling can clearly establish a right. *Linton v. Zorn*, 135 F.4th 19,

33 (2d Cir. 2025). The relevant decision need not itself have involved qualified immunity, damages, or any one procedural posture. *Id.*

### 1.2.1. The right at issue is Mr. Massimino's ability to record the exterior of the police station from the sidewalk.

A clearly established right should be phrased with a higher degree of specificity than generality, *e.g.*, *Linton*, 135 F.4th at 32, leading government employees to contend that 'rights' be defined so narrowly that immunity is a foregone conclusion. But here, the appellees' assertion was fairly close to Mr. Massimino's, making the identification of the right easy.

On the video, the appellees told Mr. Massimino multiple times that they were interrupting his recording because it was, in their view, "illegal" to record the exterior of a police station. At deposition, they clarified that their issue was with the contents of Mr. Massimino's work, not its medium. Mr. Laone testified to his belief that "[t]he First Amendment does protect the right to videotape," and so he would "not arrest somebody for merely videotaping."[2] Mr. Laone stepped in because he thought Mr. Massimino was "videotaping areas" he should not have been.[3] Mr. Benoit echoed the

---

[2] JA174, JA173.

[3] JA175.

concession. He interceded because he thought Mr. Massimino was "videotaping dangerous locations, juveniles protected by state statute, the gas pump, our entry and egress."[4]

In their motion for summary judgment, the appellees hitched their wagon to Mr. Massimino's subject matter as their sole clear-establishment argument. They complained that no appellate decision had recognized "videotaping police activity outside a police station" as a right. JA346. Later in the same filing, the pair refined their formulation as contesting the right "to videotape police activity or more specifically a police station." JA348. The latter qualifier—the building, not the employees—also tracks reality, because no defendant claimed that Mr. Massimino recorded police employees, and indeed the only employees on the recording are the appellees themselves when they approached and seized him. Thus, the right at issue here is the ability to record the exterior of a police station from a sidewalk.

---

[4] JA233. *See also* JA243 ("[I]t's how [Mr. Massimino] was videotaping and what he was videotaping.").

### 1.2.2. Statutory law and the plain view doctrine made it obvious to every Connecticut police officer that anyone is permitted to observe what is visible in public.

Qualified immunity's justification lies in ensuring that public employees have "fair warning" of what the constitution forbids. *Vega v. Semple*, 963 F.3d 259, 278 (2d Cir. 2020). It is not a thought experiment in which the likelihood of immunity increases as a defendant's reasoning decreases. "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune . . . because no previous case had found liability in those circumstances." *K. H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J.). And so, in rare situations like this one, the obvious unlawfulness of a defendant's conduct is sufficiently clear even without decisional law from this Court addressing similar circumstances. *Simon v. City of New York*, 893 F.3d 83, 97 (2d Cir. 2018). The defendants' insistence that they could restrict speech on the subject of the unobscured exterior of a police station, visible to all who passed by, was obviously unlawful even without reference to First Amendment doctrine.

Every Connecticut police officer knows the difference between public and private. The wanted person appearing in public may be warrantlessly

arrested, *United States v. Watson*, 423 U.S. 411, 423-24 (1976); the one who stays home cannot. *Payton v. New York*, 445 U.S. 573, 603 (1980). The person photographing a man walking unclothed down the sidewalk commits no crime, while the person taking a picture of the same naked man inside his own home may commit voyeurism. *See* Conn. Gen. Stat. § 53a-189a. The person listening to another's phone call at a busy bus stop does not eavesdrop; the person "not present" who uses any "device or equipment" to listen in, does. Conn. Gen. Stat. §§ 53a-187(a)(2); -189(a).

That foundational principle flowers into the most consequential doctrine for everyday policing, the plain view doctrine. Messrs. Laone and Benoit well knew on that October night in 2018 that "the police are free to observe whatever may be seen from a place where they are entitled to be." *United States v. Fields*, 113 F. 3d 313, 321 (2d Cir. 1997). So strong is the maxim that the building owner who makes "no effort to conceal the goings-on outside of" his premises may be surveilled by a remotely operated "tilt, pan, and zoom" pole camera "24 hours per day for approximately 50 days" without impediment, because his voluntary exposure of the building's exterior signifies abandonment of any privacy concern. *United States v. Harry*, 130 F.4th 342, 348, 345 (2d Cir. 2025).

Crucially for the appellees here, the plain view doctrine is not founded on any special dispensation for the *government*. It depends upon the person or entity voluntarily revealing something to the public. That revelation irrevocably disclaims confidentiality, by not "exhibit[ing] an actual (subjective) expectation of privacy." *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). So even as public employees, Messrs. Benoit and Laone had no more ability to prevent Mr. Massimino from recording the unobscured exterior of the police station than would a criminal defendant to suppress testimony of him "walk[ing] in plain view down a public sidewalk." *State v. Brown*, 903 A.2d 169, 187 (Conn. 2006). Against that daily reality of their jobs, Messrs. Benoit and Laone stretch competence beyond its breaking point to assume that what is true for them—everything in public is fair game—is not for everyone else in society.

The appellees' theory looks even more outlandish when contrasted with their employers' views, and their own litigation conduct. Had Waterbury shared the appellees' imagination that the outside of the police station was sensitive or private, it might have taken the minimal steps of erecting a fence around portions of the police station, eliminating the large lettering marking the entrance to the Youth Division, or closing the parking garage gate. It did not. And in the intervening seven years, the city has left

all of those things just as they were the night Mr. Massimino was arrested, for all the world to see online on consumer mapping websites.[5] In fact, about six months after Mr. Massimino's arrest, the police department changed the front page of its website to a very large photo of the front of the station, including a surveillance camera on the corner of the building.[6] It remains today.[7]

The police department's indifference is matched by the appellees'. Mr. Massimino's recording from the night in question contains all the items that the appellees purportedly believe are 'sensitive' or perhaps illegal to record: the garage entrance, the Youth Division door, and the surveillance cameras on the corners of the building. Mr. Massimino filed the recording as Exhibit 1 to his complaint in August 2021. JA383. Since that day, the video has been available to the public on the district court's docket, unrestricted, and yet the appellees have not moved to seal it. While such a

---

[5] Google Maps, *9 N Elm St Waterbury, CT*, https://maps.app.goo.gl/44JuByeuViwxYBpG6 (reporting image captured in October 2023) (Youth Division entrance); Google Maps, *19 N Elm St Waterbury, CT*, https://maps.app.goo.gl/iiMtTxT4Jg6WpPAeA (reporting image captured in October 2023) (parking garage).

[6] Internet Archive, *Waterbury Police Dep't*, https://web.archive.org/web/20200523114953/https://www.wtbypd.org/ (archived May 23, 2020).

[7] Internet Archive, *Waterbury Police Dep't*, https://web.archive.org/web/20250713011419/https://www.wtbypd.org/ (archived July 13, 2025).

motion would be doomed on the merits,[8] the fact that the defendants have never tried vividly illustrates that even they do not believe their privacy defense.

The obviousness of a person's right to view and memorialize what is lawfully seen in public render Mr. Laone and Mr. Benoit's conduct plainly incompetent and undeserving of immunity.

### 1.2.3. By October 2018, Mr. Massimino's right to record was clearly foreshadowed by six other circuits' rulings establishing the right for qualified immunity purposes.

The appellees had additional ample notice of their illegality by the unanimous consensus of six other Courts of Appeal.

A few months before the parties here met on that Waterbury sidewalk, the Ninth Circuit reversed dismissal of two plaintiffs' claims against the United States for its policies barring photography of streets and other areas surrounding border crossings. "The First Amendment protects the right to photograph and record matters of public interest," it concluded, "includ[ing] the right to record law enforcement officers engaged in the

---

[8] *See*, *e.g.*, *Olson v. Major League Baseball*, 29 F.4th 59, 91 (2d Cir. 2022) (affirming unsealing order where a defendant "voluntarily disclosed major portions of the content and pertinent conclusions of" the document it contended ought to remain sealed).

exercise of their official duties in public places." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F. 3d 1035, 1044 (9th Cir. 2018) (citing *Fordyce v. City of Seattle*, 55 F. 3d 436, 439 (9th Cir. 1995) (assuming the existence of such a right)).

A full eighteen years before the appellees stopped Mr. Massimino's recording, the Eleventh Circuit concluded that the First Amendment "protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F. 3d 1332, 1333 (11th Cir. 2000). Seven years before that October night, the First Circuit surveyed its own decisions, along with *Fordyce* and *Smith*, and concluded that the "terseness" with which those decisions easily located a right to record "speaks to the fundamental and virtually self-evident nature of the First Amendment's protections in this area." *Glik v. Cunniffe*, 655 F. 3d 78, 85 (1st Cir. 2011). Describing the right as one "to film government officials or matters of public interest in public space," the court held that it had been clearly established by the time of Glik's 2007 arrest for recording the detention of another on Boston Common. *Id.*

Six years before the parties here met, the Seventh Circuit enjoined the use of a state eavesdropping statute against people who planned to record

police doing their jobs in public places. The Seventh concluded that the statute both "restrict[ed] a medium of expression—the use of a common instrument of communication—and thus an integral step in the speech process," and "interfere[d] with the gathering and dissemination of information about government officials performing their duties in public" in contravention of the First Amendment. *ACLU of Illinois v. Alvarez*, 679 F. 3d 583, 600 (7th Cir. 2012).

A year before Mr. Benoit and Mr. Laone stopped Mr. Massimino from recording, the Third Circuit joined the consensus. It expressly recognized that "[t]o record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts," and thus held that "recording police activity in public falls squarely within the First Amendment right of access to information." *Fields v. City of Philadelphia*, 862 F. 3d 353, 359 (3d Cir. 2017).

That same year, the Fifth Circuit declared its "agree[ment] with every circuit that has ruled on this question," and overtly established that "the First Amendment protects the right to record the police" in a public place. *Turner v. Lieutenant Driver*, 848 F. 3d 678, 690 (5th Cir. 2017). And the Tenth Circuit that year struck a Wyoming statute forbidding entry onto private land for the purposes of collecting environmental data. Concluding

that such data collection comprised the information-gathering phase of speech generation, the court cited *Fordyce*, *Smith*, *Glik*, *Fields*, and *Alvarez* for the proposition that the statute restricted a data-gatherer "in the same manner as an individual who records a police encounter" would be encumbered by a prohibition against recording. *W. Watersheds Project v. Michael*, 869 F. 3d 1189, 1196 (10th Cir. 2017).[9]

In short, by the time the appellees here stopped Mr. Massimino's videorecording of a publicly visible building, six of the twelve general jurisdiction Courts of Appeal—every Court to rule on the issue—had declared a right to record the police in public.[10]

The District Court's faulting Mr. Massimino for not citing a decision addressing the recording of police *buildings*, specifically, was wholly wrong both as to First Amendment doctrine, and to how clear establishment is

---

[9] In 2022, the Tenth confirmed that *Western Watersheds* and the police recording cases it cited clearly established a person's "right to film the police" prior to May 2019. *Irizarry v. Yehia*, 38 F.4th 1282, 1295 (10th Cir. 2022) (reversing grant of qualified immunity to defendant who allegedly blocked the plaintiff's view of a traffic stop, shined his flashlight in the camera's lens, and then drove his police car at him).

[10] The Fourth Circuit has held that the existence of a municipal policy barring livestreaming of police interactions plausibly states a First Amendment violation at the pleading stage, *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 862 (4th Cir. 2023), but that a right to livestream had not been clearly established by then. *Id.* at 683-4. It did not go farther in the qualified immunity analysis. The Eighth Circuit has held that there was no clearly established "First Amendment right to observe police officers" as of 2015, but like the Fourth Circuit, stopped there. *Molina v. City of St. Louis*, 59 F.4th 334, 340 (8th Cir. 2023).

gauged. JA452. Where they apply, as here,[11] the Speech Clause's protections do not vary with the content of the expression. *Cohen v. California* is not a one-ride-only ticket good just for jackets bearing a three-word anti-draft message on them, any more than *Tinker v. Des Moines Indep. Cnty. Sch. Dist.* applies solely to black armbands or *Texas v. Johnson* governs the symbolic burning of a single nation's flag. Insistence on subject-by-subject precedent destroys the Speech Clause's protections by rendering them unenforceable when the wronged speaker only has standing for damages. By the District Court's reckoning, Connecticut police would be immunized against liability for arresting a person displaying a "Slow Down" sign to motorists because there is no decision on point from this Court, but not immune if the sign instead read "Cops Ahead," because the Court has spoken on that phrase.[12]

The District Court's buildings-versus-employees analysis also contravened this Court's prescribed clear-establishment methodology. "[I]t is error to demand the specificity of a factual twin" when looking for clear establishment. *Soukaneh v. Andrzejewski*, 112 F. 4th 107, 123 (2d Cir.

---

[11] *See generally United States v. Stevens*, 559 U.S. 460, 468–69, 471 (2010) (enumerating the six "well-defined and narrowly limited classes" of expression not garnering full protection). There is no serious argument that Mr. Massimino's filming comprised any of the six, and neither defendant so contended below.

[12] *Friend v. Gasparino*, 61 F.4th 77, 83, 93 (2d Cir. 2023).

2024) (cleaned up). Qualified immunity requires only fair warning, not "a case . . . explicitly warn[ing] an officer that engaging in such conduct would deprive him of qualified immunity." *Zorn*, 135 F. 4th at 33.

Just as the recordings in *Askins*, *Glik,* and their sibling-circuit decisions sought to do, Mr. Massimino's video documented an important subject: the police. Mr. Massimino recorded his video to document whether or how the Waterbury police would abide by peaceful sidewalk observations by a member of the public. Simply because no police employees were outside during the video's recording does not mean that the building they work in fell outside of the right clearly established by six other circuit decisions.

*Irizarry*, from the Tenth Circuit, illustrates the sensibility of requiring public servants to apply deductive reasoning instead of holding them only to a laundry list of fact patterns. There, the court held that the right to record police in public had been clearly established by its own analysis of the Wyoming environmental data-gathering prohibition in *W. Watersheds*. The principle granting fair warning to police was *W. Watersheds*' conclusion that observation of things in open spaces is First Amendment-protected. *W. Watersheds*, 869 F. 3d at 1196 ("An individual who photographs animals or takes notes about habitat conditions is creating

36

speech in the same manner as an individual who records a police encounter."). Transposing the analysis from ptarmigans to police changes nothing, because the right turns on the observer and the location rather than the subject he observes from where he stands. *Irizarry*, 38 F. 4th at 1290.[13]

Finally, compounding the district court's error here was its factual mistake of narrowing the disputed right to videorecording "nonpublic" or "sensitive areas of a police station."[14] As established by the contentions and admissions in their Fed. R. Civ. P. 56(c)(1) statements, the parties agreed that Mr. Massimino recorded only the exterior of the building.[15] He never left the sidewalk from where he recorded,[16] *a fortiori*, he never entered the police station. There were no visual obstructions of any kind interfering with a person's view of the police station from the sidewalk.[17] The gate on the station's built-in parking garage was wide open.[18] Mr. Massimino never

---

[13] Here, of course, the Waterbury police station is "in public," *Glik*, 655 F.3d at 85, *Alvarez*, 679 F.3d at 600, *Fields*, 862 F.3d at 359, because it sits unobscured at the center of four city streets and public sidewalks.

[14] JA452.

[15] JA288, JA383 at 00:21-04:18, JA442.

[16] JA288, JA443.

[17] JA287, JA442.

[18] JA289, JA443.

set foot in the parking garage.[19] The door to the police department's youth division was visible from the street,[20] and marked by a sign.[21] No party disputed that the interior of the police station was "nonpublic,"[22] because the fact is immaterial to someone who never went inside or raised any claim that he was denied entry. The building's interior being non-public says nothing about its unobscured exterior. In short, everything Mr. Massimino filmed was public, because it was and remains visible to anyone who walks by.

The compact, undisputed facts of the parties' interaction that evening on the sidewalk place the appellees' conduct well outside the bounds of qualified immunity for the First Amendment violation. Mr. Massimino is entitled to judgment on Count One.

---

[19] *Id.*

[20] JA290, JA443.

[21] *Id.*

[22] JA452.

**2. Because they seized Mr. Massimino based on nothing more than his being 'just on the corner filming,' the appellees violated his Fourth Amendment rights and are not qualifiedly immune.**

Count Two of Mr. Massimino's complaint contends that Messrs. Benoit and Laone unreasonably seized him in contravention of the Fourth Amendment. The undisputed facts show that the appellees seized Mr. Massimino when they flanked him on both sides and, one after another, demanded his identification in no uncertain terms. At this point, and no later, they had to have reasonable articulable suspicion for the detention. But there was not one particularized, objective fact suggesting that Mr. Massimino was committing, or was going to commit, any crime. Instead, the appellees seized him on no more than an "inchoate and unparticularized suspicion or hunch." *Terry* bars just that, so much so that the appellees do not get qualified immunity. Judgment should enter for Mr. Massimino on Count Two.

**2.1. The appellees seized Mr. Massimino when they flanked him and demanded his identification.**

Determining when Mr. Massimino was seized is the mandatory first step in resolving his claim. *E.g., Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016). A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he

39

was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Those circumstances would include "the threatening presence of several officers" as well as "language or tone indicating that compliance with the officer was compulsory." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). The overall context of an encounter also helps determine its objective level of coerciveness, *e.g., Salmon v. Blesser*, 802 F.3d 249, 252 (2d Cir. 2015), as police may not "demand . . . 'voluntary cooperation'" through an intimidating show of authority. *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

The sequence of events comprehensively documented in the video comprise a textbook show of authority. The appellees approached Mr. Massimino in front of the police station, together, in uniform, and asked him what he was taping. JA291-JA292, JA383 at 6:40, JA444. Flanking Mr. Massimino on both sides, each appellee then firmly stated in succession: "We need ID." JA292, JA383 at 7:01, JA444. Mr. Benoit made this command standing inches from Mr. Massimino's face, his arms crossed, as he moved even closer toward him. JA383 at 7:01.

Once the appellees surrounded Mr. Massimino and demanded his identification, "a reasonable person would believe that he was not free to leave." *Blesser,* 802 F. 3d at 252 (internal quotation marks and citation

omitted). The encounter involved both the "threatening presence of several officers" and "language or tone indicating that compliance with the officer was compulsory." *Lee,* 916 F. 2d at 819. *See generally Dancy*, 843 F.3d at 108 (seizure began when police, standing within two feet of plaintiff, told him "numerous times" not to use his cellphone). In *Dancy,* the court placed significant weight on the police employee's testimony that "when he gave the cell phone orders, he was within two feet of [the plaintiff], his demeanor had changed, and he used a loud, commanding voice. . . ." 843 F.3d at 108. This Court affirmed the district judge's conclusion that in light of all the circumstances, any reasonable person in the *Dancy* plaintiff's situation "would have believed that he was not free to leave." *Id.*

The same is true here. Once Messrs. Benoit and Laone barked their command that they "need[ed]" ID, any suggestion that Mr. Massimino was having a consensual conversation dissipated. Police demands that imply mandatory compliance are just that. *See, e.g.*, *United States v. Gori*, 230 F.3d 44, 47, 49 (2d Cir. 2000) (seizure where police displayed their badges and announced "Everyone step out into the hallway!"); *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000) (same where police pointed a spotlight at person and said "What, are you stupid? Come here. I want to talk to you."); *United States v. Gomez*, 633 F.2d 999, 1002, 1004

(2d Cir. 1980) (same where police displayed their badges and yelled "police"). Indeed, as the district court explained in 2015, "[c]lassic examples of what I will refer to as a 'show-of-authority' seizure include an ordinary traffic stop *or an obligatory command by a police officer to a pedestrian to stop and furnish identification*." *Ozga v. Elliot*, 150 F.Supp.3d 178, 187 (D. Conn. 2015) (emphasis added).

It is true that a mere request for identification, alone, does not automatically equate to a seizure. *Bostick*, 501 U.S. at 435. A demand is a different story because it conveys mandatory compliance. *Id.* at 437. This is because "even assuming that [crime prevention] is served to some degree by stopping and *demanding* identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Brown v. Texas,* 443 U.S. 47, 52 (1979) (emphasis added). "We need ID" was a demand—not a request.

Below, the appellees initially equivocated about whether there was a seizure at all, and if so, when it occurred. However, by the time they filed their reply to Mr. Massimino's motion for summary judgment, they conceded that he was seized when they demanded ID—if not earlier. ECF No. 46 at 8-9; *see also id.* at 9 ("Plaintiff asserts [sic] that Massimino's

disclosure as a journalist occurred after he was seized is not disputed by the defendants.").

The appellees' concession is unsurprising. All of the circumstances when the appellees made their demand—two police officers in uniform, inches away from Mr. Massimino, arms crossed, right outside the police station, employing both language and tone conveying compulsory compliance—add up to one thing: seizure.

### 2.2. At the moment they seized him, the appellees needed reasonable articulable suspicion to believe that Mr. Massimino was committing a crime.

For a seizure to be justified, *Terry* and its progeny require "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown*, 443 U.S. at 51. This is an objective inquiry requiring "specific and articulable facts which, taken together with rational inferences from those facts, provide . . . a particularized and objective basis for suspecting legal wrongdoing." *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) (cleaned up). In other words, police must identify "a specific series of events" generating the possible conclusion that a particular crime was afoot. *United States v. Lifshitz*, 369 F.3d 173, 188 (2d Cir. 2004). Indeed, "this demand for specificity in the information upon which police action is predicated is the central teaching of this Court's

Fourth Amendment jurisprudence." *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968). An "inchoate and unparticularized suspicion or hunch"—defined as "a conclusion derived from intuition in the absence of articulable, objective facts," *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)—cannot cut it. 392 U.S. at 27. Nor can "guesswork," *Vasquez v. Maloney*, 990 F.3d 232, 242-43 (2d Cir. 2021).

Further, a valid stop must be "justified at its inception." *Terry,* 392 U.S. at 20. Events transpiring after a seizure provide no answer to whether reasonable articulable suspicion for the stop existed *ab initio. United States v. Freeman*, 735 F.3d 92, 96, 102 (2d Cir. 2013). Once the appellees seized Mr. Massimino, they had to have reasonable articulable suspicion that he was committing a crime *already*. They could not develop it hours, minutes, or even seconds later, recursively using the seizure to justify itself.

The appellees' entire defense to Mr. Massimino's Fourth Amendment seizure claim rises and falls on whether they had reasonable articulable suspicion that he was committing criminal activity when they said, one after the other, "We need ID." They did not.

### 2.2.1. When the appellees seized him, Mr. Massimino was not engaging in any activity remotely suggesting criminality.

Looking to all of the objective facts known to the appellees at the time they seized Mr. Massimino reveals the vacuum of reasonable articulable suspicion they possessed on the sidewalk that night. "In assessing reasonable suspicion determinations, we take into account the totality of the circumstances supporting the investigatory stop." *Dancy*, 843 F.3d at 106 (internal quotation marks and citation omitted). Hallmarks of typical cases where this Court has found reasonable articulable suspicion include:

- **Furtive or evasive actions**. *Dancy*, 843 F.3d at 110 ("appeared nervous, attempted to conceal anything, changed direction, ran away, quickened [his] pace, or made furtive gestures"); *United States v. Villegas*, 928 F.2d 512, 514–16 (2d Cir. 1991) ("driving in a way that indicated a desire to evade surveillance").

- **Strange or unusual movements**. *Florida v. Rodriguez*, 469 U.S. 1, 4, 6 (1984) ("legs . . . pumping up and down very fast and not covering much ground, . . . as if the person were running in place"); *United States v. Bayless,* 201 F.3d 116, 133 (2d Cir. 2000) ("orchestrated" manner of loading car, out-of-state driver moving slowly and double-parking at an early hour in neighborhood known for drug activity).

- **Extreme nervousness and/or failure to make eye contact**. *United States v. Santillan*, 902 F.3d 49, 57 (2d Cir. 2018) ("very nervous" people failed to make eye contact and could not explain where they had driven from).

- **Threats, informants, or corroborated tips**. *United States v. Gonzalez*, No. 08 CR. 363, 2009 WL 613201, at *1 (S.D.N.Y. Mar. 4, 2009), *aff'd,* 441 F.App'x 31 (2d Cir. 2011), and *aff'd,* 470 F.App'x 2 (2d Cir. 2012) (tip by confidential informant that several people "were going

to rob an electronics store . . . shortly before the store closed; that the robbers would be armed with guns; and that they would arrive in a dark-colored car" materialized in front of officers' eyes).

- **Location in a secluded, deserted, or high-crime area**. *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (two men followed another down a deserted street, on a dark path not commonly used at night).

- **A concealed weapon, or something that looked like it**. *Id.* (adjusting concealed gun in shirt not consistent with any innocent explanation).

- **Completely implausible explanations**. *United States v. Reyes*, 821 F.2d 168, 169-70 (2d Cir. 1987) (unable to explain last-minute, expensive international vacation to town "not known for its vacation aspects").

Indeed, most reasonable suspicion cases can check off not just one, but multiple items from this list. *See, e.g.*, *Padilla*, 548 F.3d at 189 (reasonable suspicion where "totality of the circumstances in this case—the high-crime neighborhood, the sight of two men surreptitiously following a man whose appearance suggested drug use down an otherwise-deserted street, the choice of a dark path not commonly used at night, the apparent adjustment of a concealed firearm—provided ample basis for an investigative stop"); *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (reasonable suspicion where "personal observation of [] evasive conduct" on top of "detailed description by anonymous tipster" and location in specific high-crime area). Given the specificity and volume of

these particulars, this Court had no trouble affirming that police in *Padilla*, *Muhammad*, and the like were operating on far more than an "inchoate and unparticularized suspicion or hunch," but were instead on the firm ground of "a particularized and objective basis for suspecting legal wrongdoing." *Walker*, 965 F.3d at 186.

But Mr. Massimino's actions look nothing like those of the defendants in these cases. On that October night, all the appellees saw was a man obviously videotaping the exterior of a building in plain sight. Holding a small camera and tripod, he was openly walking on the public sidewalks around the police station in downtown Waterbury. The appellees made no claim whatsoever that Mr. Massimino tried to hide what he was doing, flee, made any unusual or furtive movements, was nervous or evasive, looked like he was armed, or gave any hint that he was going to use "deadly force." JA169. And, the appellees noticed Mr. Massimino by a purely chance look out the window, not from a tip or threat.

Finally, unlike in the typical reasonable suspicion case, when the appellees approached him, Mr. Massimino did not flee or try to avoid them. Instead, he explained his purpose in openly filming on a public street, and then declined to answer further questions. Politely insisting that he was

doing nothing wrong, he requested, on video, that the appellees explain what crime they thought he was committing.

In short, the gulf between the typical reasonable suspicion case and the facts of October 30, 2018 confirms that the appellees here did not have "a particularized and objective basis for suspecting legal wrongdoing" before demanding ID from Mr. Massimino. They had the opposite: "a conclusion derived from intuition in the absence of articulable, objective facts." *Singletary*, 798 F.3d at 60.

### 2.2.2. Neither the appellees' in-the-moment justification, nor their pretextual rationale, saves them from summary judgment.

To avoid the cut-and-dried facts, the appellees advanced two justifications. When they confronted Mr. Massimino, the appellees mainly insisted that he was committing the non-crime of recording a police station. Flailing for a response beyond "reasonable suspicion," JA383 at 08:26-08:28, they also resorted to asking Mr. Massimino to explain how they would know that he was not planning an attack on the police station, or that he possessed no ill will. *Id.* at 07:20-07:27. Both of these justifications fail to carry the day.

### 2.2.2.1. From their own mouths, the appellees' rationale for seizing Mr. Massimino was that recording police stations is "not allowed."

Because reasonable articulable suspicion is objective, "an officer's subjective beliefs are irrelevant," *Walker*, 965 F.3d at 186 n. 2, with one vital exception. Subjective intent "*is* relevant . . . to the extent that that intent has been conveyed to the person confronted." *Michigan v. Chesternut*, 486 U.S. 567, 576 n.7 (1988) (emphasis added).

This is true here. On the night in question, the appellees repeatedly conveyed to Mr. Massimino why they were detaining him: Because, in their words, it was forbidden for him to videotape a police station. This happened several times over the course of the parties' conversation. When Mr. Massimino asked initially, Mr. Benoit claimed that Massimino presented "a security issue," because he was "videotaping a police station." JA383 at 7:08-7:09. Mr. Benoit then told Mr. Massimino several more times that he was "not allowed to videotape a police station." *Id.* at 8:07-8:18. Mr. Laone agreed with Mr. Benoit's assertions that it was illegal to videorecord a police station. *Id.* at 8:19-8:21. He then added that Mr. Massimino was "videotaping secure areas of the police station" by

videorecording what was in plain view from the sidewalk. *Id.* at 8:37.
Finally, the appellees stated that they were detaining Mr. Massimino for the
crime of "reasonable suspicion." *Id.* at 8:24-8:28; 8:48.

A made-up or nonexistent crime is not "grounds for suspecting actual
legal wrongdoing," *Freeman*, 735 F.3d at 103. Detaining Massimino
because the appellees thought, or wished, that recording the exterior of a
building was "not allowed" in Connecticut is "a paradigmatic violation of
the Fourth Amendment." *Vasquez*, 990 F.3d at 235 (reversing summary
judgment where police detained plaintiff because they thought that there
was an outstanding warrant for his arrest, but did not check for one before
seizing him). The same goes for the "crime" of "reasonable suspicion."

Federal circuit caselaw is replete with examples. *See, e.g.*, *Mglej v.
Gardner*, 974 F.3d 1151, 1163 (10th Cir. 2020) (no reasonable suspicion for
non-crime of declining to produce a physical piece of identification during
seizure); *Jones v. Clark*, 630 F.3d 677, 683 (7th Cir. 2011) (same where "[i]t
is not a crime to take pictures on the street"); *United States v. Williams*,
615 F.3d 657, 667 (6th Cir. 2010) (same where "loitering is not a crime
under state or local law"); *United States v. Henderson*, 463 F.3d 27, 31, 46-
47 (1st Cir. 2006) (same where based on car passenger's failure to wear
seatbelt, which in Massachusetts "is not a crime"); *United States v. Ubiles*,

224 F.3d 213, 217-18 (3d Cir. 2000) (same where based on tip of firearms possession and Virgin Islands law did not criminalize firearms possession).

Because videotaping the exterior of a police station is not a crime in Connecticut, videotaping specific exterior areas of a police station is not, either. And any suggestion that certain parts of the building's exterior are especially "private" was negated by the fact that everything Mr. Massimino filmed is equally visible to anyone passing by on the sidewalk or street, and to this day remains visible to any person, anywhere, using Google Maps or the like. At deposition, the appellees undermined their own focus on supposedly "sensitive" areas by conceding there was no part of the building's exterior Mr. Massimino could film that would not make them suspicious. JA236-JA237. Thus, whether Mr. Massimino was filming the exterior of the youth division or the main entrance or a railing is beside the point.

The appellees told Mr. Massimino they were detaining him for videotaping the police station. This Court should not ignore the appellees' in-the-moment explanation for their conduct.[23] But videotaping the police

---

[23] Years later, at deposition and in affidavits filed at summary judgment, the appellees slightly tweaked this argument by trying to say it was the "manner" in which Mr. Massimino was filming that made them suspicious. *See, e.g.*, JA386 ¶ 10; JA393 ¶ 12 (identical statements that "[t]he manner in which [Plaintiff] was videotaping was suspicious and alarming"). But they did not articulate anything about the "manner" of filming, or Mr. Massimino's conduct. Instead, they again recited *what* Mr. Massimino

station is not a crime, and thus cannot, as a matter of law, generate reasonable suspicion.

### 2.2.2.2. The appellees' pretextual demand that Mr. Massimino disprove their assumption that he was up to no good contravenes the meaning of "reasonable articulable suspicion."

While the appellees repeatedly told Mr. Massimino they were detaining him for videotaping the police station, over time, the appellees doubled down on a pretextual justification: They *subjectively* thought Mr. Massimino may have been planning to engage in some ambiguous criminal activity, like attacking the police station, because Mr. Massimino could not disprove a negative. Put another way, the appellees did not think Mr. Massimino was committing a crime—they just claimed the inability to know that he *wasn't*.

As a threshold matter, the Court should take the appellees' rejoinder to Mr. Massimino with a grain of salt, given that it differs from what they mostly insisted the problem was when they seized him. More importantly, "he could have been doing anything" is the very definition of an "inchoate

---

was filming: "the gas pumps, the juvenile division." *Id.* This brings the appellees full circle: What made them suspicious was the filming of a public building, full stop.

and unparticularized suspicion or hunch." *Terry,* 392 U.S. at 27. "The government must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Slocumb*, 804 F.3d 677, 684 (4th Cir. 2015) (cleaned up) (no reasonable articulable suspicion).

   True, to have reasonable articulable suspicion, the appellees did not need to rule out every innocent explanation of Mr. Massimino's conduct. *E.g.*, *United States v. Hagood*, 78 F.4th 570, 579 (2d Cir. 2023). But here, they did far less: They ruled out nothing and guessed about everything. This wide-ranging speculation about all possible variety of crimes they did not know Mr. Massimino did not plan to commit, despite not seeing evidence of any, flies in the face of the baseline *Terry* requirement that the appellees "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry,* 392 U.S. at 21. In short, it is the failure to articulate *anything at all* that dooms the appellees' argument on the merits. *Id.* at 27.[24]

---

[24] In endorsing the appellees' wide-ranging speculation about any manner of offenses, the district court suggested that "[t]hough it is not settled law, the Second Circuit likely permits officers to have reasonable suspicion of generalized criminal activity rather than suspicion of a specific crime," SPA8 n.1, citing *Santillan*, 902 F.3d at 57. That case involved a post-traffic stop seizure of "very nervous" people driving through a known drug trafficking corridor. It may be that the officer involved did not know which specific federal narcotics offense was afoot. But that is very different from endorsing standardless seizures for quite literally any crime, which is not the law of this Circuit.

Generalized concerns that the appellees may have had about safety do not change this analysis, either. *Terry* and its progeny do not permit a police officer to justify a stop on a concern for officer safety that is untethered to a reasonable suspicion of criminal activity. *United States v. Dorlette*, 706 F.Supp.2d 290, 299 (D. Conn. 2010). In *Dorlette,* police officers attempted to justify an investigatory stop of several men in a dark street by opining that a "fight was possible, it could happen," *id.* at 301, which the court held was an "inchoate . . . hunch that does not provide justification." *Id.* at 302 (alteration in original). The defendant officers then "repeatedly referred to their concern for officer safety," *id.* at 300, but the incantation is meaningless "unaccompanied by any articulable facts, or inferences drawn from them, that could give rise to a reasonable suspicion that Dorlette was, or was about to be, engaged in criminal activity," and was thus nothing more than "rank speculation." *Id.* at 304. Worse for the appellees here, at deposition, Mr. Benoit undermined his own generic appeal to safety by admitting he did not think Mr. Massimino was armed, and had no suspicion that night of Mr. Massimino "using deadly force." JA169.

Finally, the appellees cannot use Mr. Massimino's reaction to their seizure of him—including refusal to provide his ID or his journalism

credentials—to justify it *ab initio*. This Court brushed off a similar attempt in *Freeman*, where the government had harped on Freeman's refusal to engage with police post-seizure. 735 F.3d at 102. Referencing the moment when Freeman was approached by police while walking along a street in the Bronx, this Court held that prosecutors had "not identified specific and articulable facts that would have justified a stop *at that point*; instead, they have attempted to delay the point of the seizure in order to include incidents that occurred after the seizure in the reasonable suspicion analysis." *Id*. This Court refused to create "paradoxical" class of individuals who could not be forced to cooperate with police, but could nonetheless be penalized for refusing to cooperate with police. *Id*.

As in *Freeman*, the point of seizure is the line of demarcation. Given that "[r]easonable suspicion must arise *before* a search or seizure is actually effected," *United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (cleaned up), and that the appellees seized Mr. Massimino by demanding his ID, it does not matter whether Mr. Massimino in fact provided his ID to the appellees, or said he was a journalist and did not provide credentials. It does not matter whether he declined to answer follow-up questions about what kind of a story he was doing. It does not matter that he did not disclose that he was performing a so-called First Amendment audit. It does

55

not even matter if the appellees thought he acted differently than the typical journalists they encountered, as they later suggested: All of these things occurred after he was seized. The appellees conceded as much below,[25] agreeing that their conversation with Mr. Massimino in which Mr. Massimino stated he was a journalist and then politely refused to answer further inquiries did not justify their seizure of him.

Because the appellees, even with the benefits of years of hindsight, cannot articulate what crime they thought was afoot—and because, regardless, they may not invoke any events that took place post-seizure— they did not have reasonable suspicion to seize Mr. Massimino.

### 2.2.3. The Fifth Circuit holding relied on by the district court contains no analysis and is unpersuasive.

Below, both the appellees and the district court cited to the Fifth Circuit's exceedingly brief discussion of outside-a-police-station seizure in *Turner*, 848 F.3d at 691-2. When it comes to the reasonableness of seizing Mr. Massimino for recording from the sidewalk that October evening,

---

[25] "Plaintiff asserts that Massimino's disclosure as a journalist occurred after he was seized is not disputed by the defendants. [sic] . . . . *His disclosure as a journalist did not form the basis of the Terry stop*, but simply heightened the defendants' already existing suspicions that some criminal activity might be afoot and served to further hinder the defendants' duty to investigate." D. Conn. ECF # 46 at 9 (emphasis added).

*Turner* contravenes this Court's teachings and is at any rate so conclusory as to be unpersuasive.

First, what matters for the constitutionality of a seizure is the objective facts as they existed at the time of its occurrence. Without addressing any facts, *Turner* simply stated that videorecording outside of a police station "potentially threatened security," and that the defendants to that litigation "could have found" filming "suspicious." *Id.* at 692 (cleaned up). But this Court does not look to the kind of factual stare decisis—all observation of police stations is suspicious—that the Fifth Circuit announced.

*Turner*'s two-sentence analysis is also useless because recording the government is ubiquitous. As the Third Circuit explained in *Fields*, while filming the police may have been rare when the Rodney King video shook the country in 1991, by 2017, "the recording of police activity is a widespread, common practice" and one "of great importance." 862 F.3d at 357. In today's world, recording police is a routine exercise of free speech. *See Glik*, 655 F.3d at 84 ("The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera," and thus officers must exercise restraint "when they are merely the subject of

57

videotaping that memorializes, without impairing, their work in public spaces"). In these smartphone-saturated times, suggesting, as the *Turner* court blithely did, that anyone with an iPhone or video camera might be casing a building and is thus detainable goes against "commonsense judgments and inferences about human behavior." *Singletary*, 798 F.3d at 60 (cleaned up).

*Turner* is doubly unpersuasive on its seizure pronouncements for its failure to reconcile them with its First Amendment conclusions. In a single decision, that court may have recognized a clearly established right to record the police and simultaneously doomed it, since anyone exercising it near a police station is, by its analysis, fair game for detention.

Lastly, in *Turne*r, the Fifth Circuit was reviewing grants of qualified immunity for Turner's detention—but, paradoxically, not his arrest—at the motion to dismiss stage. In summarily affirming qualified immunity for the seizure, it found that the defendants could have reason to be suspicious of Turner's filming of a Texas police station, particularly given recent attacks on other Texas police stations several months earlier. *Turner*, 848 F.3d at 692. Here, the appellees had the benefit of discovery, and the ability to put on any evidence they wish. They still offered zero objective, particularized facts that would support reasonable articulable suspicion to seize Mr.

58

Massimino—no tips, no threats, no furtive actions, no specific behavior of any kind other than, again, the mere recording of a police station from a public sidewalk. The law requires far more than the appellees' generalized assumptions.

Because the appellees did not have reasonable suspicion to seize Mr. Massimino, the grant of summary judgment on the merits of Count Two should be vacated, and judgment should enter for Mr. Massimino instead.

### 2.3.  The appellees are not entitled to qualified immunity.

Without a particularized and objective basis for suspecting that Mr. Massimino was engaged in criminal activity, the appellees may not be excused from liability. "Since *Terry*, it has been clearly established that when an officer can point to *no* facts at all to justify a hunch, the detention violates the Fourth Amendment." *Vasquez*, 990 F.3d at 240 (emphasis in original).

In *Vasquez*, this Court affirmed the lower court finding of no qualified immunity given that "an officer's unconfirmed hunch that an arrest warrant might possibly exist, coupled with nothing more than the officer's recognition of a suspect from prior arrests, does not constitute reasonable suspicion." *Id.* at 243; *see also Dancy*, 843 F.3d at 110 (affirming, at Rule

50 stage, district court's denial of qualified immunity where defendant "had no basis to suspect [the plaintiff] of legal wrongdoing"); *Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (vacating summary judgment on the issue of qualified immunity "in the absence of indicia that this Court has found to support individualized reasonable suspicion in the past"). *Accord Chestnut v. Wallace*, 947 F.3d 1085, 1092 (8th Cir. 2020) (affirming denial of qualified immunity on summary judgment because a "vague, conclusory statement that a person is suspicious is insufficiently specific to support his detention by the police, and merely observing police officers at work cannot give rise to a reasonable inference that criminal mischief is afoot," and further finding that police officers' allusions to attacks on police in the same location months earlier did not "tip the balance" in their favor).

Invoking qualified immunity on Mr. Massimino's Fourth Amendment seizure claim would twist a qualified immunity into an absolute one. Were the appellees' argument to prevail, any police employee could evade liability under § 1983 for an unreasonable seizure by simply making up a wild suspicion about what a person might be doing, and then announcing that the Second Circuit had never opined on the application of the facts at hand to that far-fetched offense. "[E]ven though Fourth Amendment case law is often highly-fact specific, that does not mean it produces no clearly

established law.*" Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 85 (D. Conn. 2016) (denying qualified immunity in Fourth Amendment case). Where, as demonstrated above, the appellees' detention of Mr. Massimino relied entirely on an "inchoate and unparticularized suspicion or hunch" that cannot satisfy *Terry*, they are not qualifiedly immune.

**3.    Connecticut's interference charge does not apply to ID declinations during extra-legal seizures, and so the appellees necessarily lacked probable cause to arrest, and commence a prosecution, for it.**

Count Three contends that Mr. Benoit, who arrested Mr. Massimino and initiated criminal proceedings that he was required to attend (nearly twenty court dates in total), engaged in malicious prosecution. The arrest allegation of Count Two contends that the appellees arrested Mr. Massimino for interference in contravention of the Fourth Amendment. The key element of both constitutional offenses—absence of probable cause—was met here, where Mr. Massimino was arrested and prosecuted for an offense that the state supreme court has deemed off-limits to invalid *Terry* stops.

To prevail on a § 1983 claim for deprivation of one's Fourth Amendment right against unreasonable seizure for an arrest, a plaintiff must demonstrate that the defendants lacked probable cause. *E.g.*,

*Soukaneh v. Andrzejewski*, 112 F.4th 107, 120 (2d Cir. 2024). To do so on a Fourth Amendment malicious prosecution claim, the plaintiff must prove a seizure, and must establish the elements of a malicious prosecution claim under state law.[26] *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022). Because the appellees readily conceded that they had no probable cause for any charge *other* than the one that they arrested Mr. Massimino for—and for which Mr. Benoit commenced a criminal prosecution—the determinative question on both counts is a straightforward one. Does a declination to identify oneself during a consensual encounter with police create probable cause for a Conn. Gen. Stat. § 53a-167a violation?

The answer is no, following cleanly from the lack of reasonable articulable suspicion: (1) If there was no reasonable articulable suspicion, the *Terry* stop was unlawful. (2) If the *Terry* stop was unlawful, any supposed noncompliance from Mr. Massimino–such as refusing to identify himself—could not comprise probable cause for interference.

---

[26] Those elements are "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff, (2) the criminal proceedings terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Bhatia v. Debek*, 948 A.2d 1009, 1017 (Conn. 2008) (cleaned up). There is no question that Mr. Benoit initiated a prosecution ending in Mr. Massimino's favor. Meanwhile, Connecticut law takes the lack of probable cause as establishing malice: "[i]f the evidence supports the former, we need not consider the latter, since it may be inferred." *Zenik v. O'Brien*, 79 A.2d 769, 772 (Conn. 1951).

First, the unlawfulness of Mr. Massimino's seizure was addressed *supra*. Second, as is beyond debate, an unlawful *Terry* stop cannot form the basis of an interference prosecution when the detainee declines to say or do what the police want. Unless validly seized, a person's conversation with the police is purely voluntary. Police cannot require a person to identify himself absent "a reasonable suspicion that he was involved in criminal conduct." *Brown*, 443 U.S. at 52. To remain within those Fourth Amendment guardrails, the Connecticut Supreme Court has limited the declination-to-ID application of Conn. Gen. Stat. § 53a-167a *only* to "legitimate" *Terry* stops, *i.e.*, those supported by reasonable articulable suspicion. *State v. Aloi*, 911 A.2d 1086, 1097 n.22 (Conn. 2007).

More broadly, this Court recently reiterated that refusal to obey unlawful police commands cannot generate probable cause. *Friend*, 61 F.4th at 86. In *Friend*, a police employee, Gasparino, told a person standing on a sidewalk displaying a sign to stop doing so; when he did not obey, Gasparino arrested him for violating Conn. Gen. Stat. § 53a-167a. *Id*. As this Court put it, "We do not believe that Gasparino's directive could create probable cause where there was none before." *Id*. at 86. That is, since "Friend was violating no law by standing on the sidewalk and displaying his

sign, Gasparino had no lawful reason to order him to desist from that conduct." *Id.*

Here, similarly, probable cause cannot be manufactured from Mr. Massimino's polite declination to identify himself when he was not lawfully seized (and thus not required to say or do anything at all, because his participation in any interaction was consensual). "There was no probable cause to arrest [Massimino] because § 53a-167a(a) did not prohibit [Massimino]'s actions and § 53a-167a(a) was the only basis that has been suggested for believing that [Massimino] was committing any crime." *Friend*, 61 F.4th at 85.

The conclusion means three things. First, that the defendants lacked probable cause to arrest Mr. Massimino for interference. Second, that they could never have had arguable probable cause for qualified immunity purposes, since the Connecticut Supreme Court's authoritative interpretation of § 53a-167a in *Aloi* forbids applying the statute to identification declinations during consensual encounters, and qualified immunity never "shield[s] performance that . . . was in violation of clearly established law." *Rupp v. Buffalo*, 91 F.4th 623, 642 (2d Cir. 2024). And third, that Mr. Benoit could never have had probable cause to initiate the criminal prosecution.

Judgment on Count Two must therefore enter for Mr. Massimino. Count Three requires a slightly different result here, though. Mr. Benoit claimed entitlement to qualified immunity, but the District of Connecticut never decided the question. It ought to do so in the first instance, as it is the "practice in this Circuit when a district court fails to address the qualified immunity defense to remand for such a ruling." *Tanvir v. Tanzin*, 894 F.3d 449, 472 (2d Cir. 2018) (cleaned up).

## Conclusion

For the above reasons, this Court should reverse with instructions to enter summary judgment for Mr. Massimino on Counts One and Two, and remand for a determination of qualified immunity on Count Three.

August 11, 2025

/s/ Dan Barrett
Dan Barrett
Elana Bildner
Jaclyn Blickley
ACLU Foundation of Connecticut
P. O. Box #320647
Hartford, CT 06132
(860) 471-8471
e-filings@acluct.org

*Counsel for Mr. Massimino*

65

## Federal Rules of Appellate Procedure Form 6
## Certificate of Compliance with Rule 32(a)

1.      This brief complies with the type-volume limits of Fed. R. Ap. P.

32(a)(7)(B), as well as Local Rule 32. 1(a)(4), because it contains 13,552

words, excluding the parts exempted by Fed. R. App. P. 32(f).


2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as well

as Local Rule 32. 1, because it has been prepared in a proportionally spaced

typeface using Microsoft Word 2019 in 14-point Georgia font.


/s/ Dan Barrett
Dan Barrett


August 11, 2025

## Certificate of Service

I hereby certify that true and accurate copies of the foregoing brief were served electronically through the Court's CM/ECF system on August 11, 2025 to all parties of record.

/s/ Dan Barrett
Dan Barrett

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Order of the Honorable Robert N. Chatigny
    Appealed From, dated March 31, 2025 ................ SPA-1

SPA-1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KEITH MASSIMINO,                    :
                                    :
        Plaintiff,                  :
                                    :
v.                                  :   Case No. 3:21-cv-01132 (RNC)
                                    :
MATTHEW BENOIT AND FRANK LAONE,     :
                                    :
        Defendants.                 :

RULING AND ORDER

Plaintiff Keith Massimino brings this suit under 42 U.S.C. § 1983 against Waterbury Police Sergeants Matthew Benoit and Frank Laone in their individual capacities for alleged violations of his First and Fourth Amendment rights.  In October 2018, the plaintiff was making a video recording of the Waterbury police station for the purpose of conducting a "First Amendment" audit.  He planned to upload the video to his YouTube page, which he maintained under the name "Northeast Auditor." The defendants, unaware of the plaintiff's identity or purpose, saw him videotaping the Police Department building, approached him, and asked for his identification, which he repeatedly declined to provide.  They then arrested him for misdemeanor interference under CONN. GEN. STAT. § 53a-167a.  The parties have filed cross-motions for summary judgment.  For reasons stated below, plaintiff's motion is denied and defendants' motion is granted.

1

SPA-2

I.

Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When evaluating a summary judgment motion, a court reviews all the record evidence in the light most favorable to the non-moving party and determines whether the non-moving party has met its burden to present evidence that would permit a jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 & 255 (1986). Conclusory allegations, conjecture, and speculation are insufficient to create a genuine dispute of material fact. Shannon v. N.Y.C Transit Auth., 332 F. 3d 95, 99 (2d Cir. 2003).

II.

A. Count One: First Amendment

In count one, plaintiff alleges that the defendants violated his rights under the First Amendment by interfering with his videotaping of the police station. Defendants seek summary judgment on this count based on qualified immunity.

Qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231

2

SPA-3

(2009).  The defense "shields government officials from claims for money damages unless a plaintiff adduces facts showing that '(1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct.'"  Mara v. Rilling, 921 F. 3d 48, 68 (2d Cir. 2019) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  A finding for the defendant on either prong is dispositive and a district court may consider them in any order.  Mara, 921 F. 3d at 68.

In determining whether a right was clearly established at the relevant time, it is necessary to consider the "particularized" right at issue.  See Anderson, 483 U.S. at 640; al-Kidd, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.").  For a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, for a federal right to be clearly established in Connecticut, it must have been previously recognized by the Second Circuit or the Supreme Court.  But a right may be clearly established, even in the absence of controlling appellate authority, by virtue of "a robust 'consensus of cases of persuasive authority.'"  Ashcroft v. al-

3

Kidd, 563 U.S. 731, 742 (2011) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).

Plaintiff contends that his right to make a video recording of the police station in October 2018 was clearly established by circuit court rulings outside the Second Circuit. See Glik v. Cunniffe, 655 F. 3d 78, 85 (1st Cir. 2011); Fields v. City of Philadelphia, 862 F. 3d 353, 360 (3d Cir. 2017); Turner v. Driver, 848 F. 3d 678, 688 (5th Cir. 2017); ACLU of Ill. v. Alvarez, 679 F. 3d 583, 597-98 (7th Cir. 2012); Fordyce v. City of Seattle, 55 F. 3d 436, 439 (9th Cir. 1995); Irizarry v. Yehia, 38 F. 4th 1282, 1294 (10th Cir. 2022); see also Smith v. City of Cumming, 212 F. 3d 1332, 1333 (11th Cir. 2000). In 2015, a district court in this Circuit stated that "the right to record police activity in public, at least in the case of a journalist who is otherwise unconnected to the events recorded, was 'clearly established'" by 2011. Higginbotham v. City of New York, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015).

All but one of the cases on which plaintiff relies involved the right to make a video recording of police officers performing their duties in public spaces. See, e.g., Glik, 655 F. 3d at 79 (recognizing "a constitutionally protected right to videotape police carrying out their duties in public"). In contrast, this case involves making a videotape of nonpublic spaces. See Summary of Undisputed Material Facts, ECF 44-1, at

¶ 70 (uncontested that the Waterbury Police Department building's interior is nonpublic because "[a]ccess to the public is not allowed without permission except in the lobby area").

The scope of plaintiff's videotaping of the police station encompassed the entry to the offices of the Youth Division, where officers conduct victim interviews and process juveniles, who are entitled by statute to confidentiality. Id. at ¶¶ 64-65. In addition, it encompassed other entry and exit points, surveillance cameras, and an underground garage with gas tanks and undercover vehicles. Id. at ¶ 65. The rulings on which plaintiff relies do not address one's right to videotape sensitive, nonpublic areas of a police station that similarly implicate privacy rights of juveniles and witnesses as well as legitimate concerns for station security and officer safety.

Plaintiff cites one case recognizing a right to videotape a police station, Turner v. Lieutenant Driver, 848 F. 3d 678 (5th Cir. 2017). Like the plaintiff here, Mr. Turner videotaped a police station from a public sidewalk and subsequently refused to provide officers with identification. Id. at 683. The Fifth Circuit stated that "a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions." Id. at 688. However, it affirmed the district court's ruling that the defendants were entitled to qualified immunity because this right was not clearly

5

SPA-6

established at the relevant time.

The Fifth Circuit's decision in Turner does not suffice to establish that plaintiff had a clearly established right to make a video recording of the Waterbury police station in 2018.  The decision in Turner framed the right broadly as the "right to record the police."  Id. at 687.  This framing does not provide the degree of particularity required by the Supreme Court to find that a right is "clearly established."  See al-Kidd, 563 U.S. at 742.  Indeed, the Court in Turner did not address a right to videotape a police station, let alone a right to videotape nonpublic areas or sensitive areas like the ones at issue here.

No case law placed the right claimed here beyond debate in October 2018.  Accordingly, defendants' motion for summary judgment on count one based on qualified immunity will be granted.

B. Count Two: Fourth Amendment Unreasonable Seizure

Count two alleges that the defendants violated plaintiff's rights under the Fourth Amendment by subjecting him to an investigative stop without reasonable suspicion and by arresting him without probable cause.  Defendants contend that there was no such violation.  I conclude that plaintiff has failed to raise a genuine issue of material fact with regard to either alleged violation.

"The Fourth Amendment protects against 'unreasonable . . . seizures' of persons." Mara, 921 F. 3d at 69 (quoting U.S. Const. amend. IV).  A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980).  An arrest requiring probable cause is a prototypical seizure, but the Fourth Amendment also covers "seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); see Terry v. Ohio, 392 U.S. 1 (1968).

   1. The Investigative Detention

   Plaintiff contends that officers seized him when they approached him on the sidewalk and asked for identification. Not all requests for identification are seizures.  Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County, 542 U.S. 177, 185 (2004).  To determine whether an interaction constituted a seizure, courts consider "all of the circumstances surrounding the incident," including the number of officers involved, their tone, and the presence or absence of a weapon.  Mendenhall, 446 U.S. at 555.

   The record reflects that when the defendants approached the plaintiff on the sidewalk, they said, "we need ID."  At a later point in their interaction with the plaintiff, they asserted

7

SPA-8

that their demand for identification was "a lawful order."  ECF
44-1 ¶¶ 95, 101.  Construed most favorably to the plaintiff, the
latter statement indicated that, as of that point in the
encounter, compliance with the demand for identification had
become compulsory.

To determine whether the officers' detention of the
plaintiff for the purpose of obtaining his identification was
supported by reasonable suspicion, it is necessary to "look at
the 'totality of the circumstances' . . . to see whether the[y]
. . . ha[d] a 'particularized and objective basis for suspecting
legal wrongdoing.'"  United States v. Arvizu, 534 U.S. 266, 273
(2002) (quoting Sokolow, 490 U.S. at 7).[1]  Viewing the record
most favorably to the plaintiff, I conclude that the officers'
detention of the plaintiff was supported by reasonable
suspicion.

The record shows the following.  At the time the officers
approached the plaintiff, he had been videotaping the Police
Department building for more than six minutes from all angles,
capturing sensitive areas of the building, as discussed above.
ECF 44-1 ¶¶ 20, 38, 76, 91.  The plaintiff's unusual behavior

_____

[1] Though it is not settled law, the Second Circuit likely permits officers to
have reasonable suspicion of generalized criminal activity rather than
suspicion of a specific crime.  See United States v. Santillan, 902 F. 3d 49,
57 (2d Cir. 2018) ("We conclude [that the factors establishing reasonable
suspicion] were sufficient here to provide Officer Moreira, an experienced
police officer trained in narcotics trafficking interdiction, with
articulable and specific facts leading him to believe that the two men may
have been involved in some type of criminal activity.") (emphasis added).

caused the officers to suspect that he might have an illicit
purpose, especially in light of prior attacks on other police
stations.  Defendant Laone was in charge of the station's
security and had a duty to protect officers and civilians in the
building.  ECF 44-1 ¶ 71.  Accordingly, the officers approached
the plaintiff and asked him what he was doing.  Id. ¶ 48.
Plaintiff responded that he was a journalist.  But his behavior
differed significantly from that of journalists with whom the
officers had previously interacted.  In the past, each time a
journalist wanted to film the station, the police department was
given prior notice and the journalist provided the police with
press credentials.  Id. ¶¶ 52, 73-74.  Plaintiff declined to
provide the defendants with credentials, declined to answer
their follow-up questions about the type of story he was doing,
did not disclose that he was conducting a First Amendment audit,
and repeatedly refused to provide identification even after the
officers expressed safety and security concerns.  Id. ¶¶ 27, 49-
50, 53, 75-76.

     Given the limited information plaintiff provided and the
ways his behavior differed from that of other journalists, a
conscientious officer could reasonably suspect that criminal
activity was afoot.  The investigative detention of the
plaintiff was therefore adequately supported by reasonable
suspicion.

Even assuming the detention of the plaintiff was not supported by reasonable suspicion, the defendants are entitled to summary judgment based on qualified immunity because their conduct did not violate a clearly established right.  No case on point decided by either the Supreme Court or the Second Circuit has been cited or found.  In the absence of such authority, a reasonable officer could think that briefly detaining the plaintiff for further investigation did not violate the Fourth Amendment.

In Turner, the Fifth Circuit concluded that qualified immunity applied in similar circumstances.  See Turner, 848 F. 3d 678 at 691 ("Even if we assume arguendo that [the officers] violated Turner's Fourth Amendments [sic] rights by detaining him without reasonable suspicion, we cannot say that this detention was objectively unreasonable in light of clearly established law.").  The Court explained that although Turner was merely filming routine activities taking place at the police station, an objectively reasonable officer could have suspected that he was casing the station for an attack, stalking an officer, or otherwise preparing for criminal activity, and thus could have found his filming sufficiently suspicious to warrant questioning and  brief detention.  The same is true here.  In fact, this is a stronger case for qualified immunity because the

plaintiff was filming sensitive areas of the police station rather than just routine activities.

Accordingly, the defendants' motion for summary judgment with regard to the investigative detention will be granted.

2. The Arrest

Plaintiff contends that the defendants violated the Fourth Amendment by arresting him without probable cause. "[P]robable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Walczyk v. Rio, 496 F. 3d 139, 156 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F. 3d 845, 852 (2d Cir. 1996)). The officers contend that they had probable cause to arrest plaintiff for misdemeanor interference as a matter of law.[2] Viewing the record most favorably to the plaintiff, I agree.

---

[2] Defendants also contend that plaintiff is collaterally estopped from arguing that probable cause was lacking because he made the same argument in support of a motion to dismiss the underlying criminal case and the argument was rejected. Under Connecticut law, a litigant is precluded from raising an issue in a subsequent action only if the issue was "fully and fairly litigated in the first action." Aetna Cas. & Sur. Co. v. Jones, 596 A. 2d 414, 421 (Conn. 1991)). "[U]nless the unsuccessful party in the prior litigation had the opportunity to seek appellate review, that issue has not been 'fully litigated' for the purposes of collateral estoppel." Weiss v. Weiss, 998 A. 2d 766, 782 n.20 (Conn. 2010). Plaintiff did not have an opportunity to seek appellate review of the trial court's ruling on probable cause, so collateral estoppel does not apply.

SPA-12

Defendants charged the plaintiff with violating CONN. GEN. STAT. § 53a-167a, which prohibits "interfering with an officer" by "obstruct[ing], resist[ing], hinder[ing], or endanger[ing]" an officer "in the performance of [the officer's] duties." Refusing to provide identification may violate § 53a-167a because it "is likely to impede or delay the progress of the police investigation, even when that refusal is peaceable." State v. Aloi, 911 A. 2d 1086, 1093 (Conn. 2007). See e.g., State v. Silva, 939 A. 2d 581, 588 (Conn. 2008) (defendant violated § 53a-167a when she refused to provide identifying documents to police); Armstrong v. Martocchio, 3:18 CV 580 (RMS), 2021 WL 1723243, at *10 (D. Conn. Apr. 30, 2021) (there was probable cause to arrest plaintiff for violating § 53a-167a because she "refus[ed] to move her truck . . ., refus[ed] to identify herself when requested, and walk[ed] away from the defendant").

It is undisputed that plaintiff repeatedly refused to provide the officers with identification even after they explained their safety and security concerns. Because such a refusal can be sufficient to violate § 53a-167a, a jury would have to find that the plaintiff was properly arrested for misdemeanor interference. The state court in the underlying criminal case reached the same conclusion when it denied a

motion to dismiss the criminal charge for lack of probable cause.

Even if the arrest lacked probable cause, the defendants are entitled to qualified immunity because they had at least "arguable probable cause" for the arrest.  Zalaski v. City of Hartford, 723 F. 3d 382, 390 (2d Cir. 2013) (quoting Escalera v. Lunn, 361 F. 3d 737, 743 (2d Cir. 2004)).  An arresting officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  Washington v. Napolitano, 29 F. 4th 93, 105 (2d Cir. 2022) (quoting Zalaski, 723 F. 3d at 390).  For the reasons set forth above, it was objectively reasonable for the officers to believe that probable cause existed to arrest the plaintiff for violating § 53a-167a. The state court's finding of probable cause in the underlying criminal case after considering a counseled motion to dismiss underscores the appropriateness of qualified immunity.

Therefore, summary judgment will be granted to the defendants with regard to the claim based on the arrest.

C. Count Three: Fourth Amendment Malicious Prosecution

Plaintiff also brings a claim for malicious prosecution against defendant Benoit.  "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a

SPA-14

plaintiff must show a violation of his rights under the Fourth Amendment and establish the elements of a malicious prosecution claim under state law." Fulton v. Robinson, 289 F. 3d 188, 195 (2d Cir. 2002) (internal citations omitted). The record does not permit a reasonable finding that Benoit violated the plaintiff's rights under the Fourth Amendment. Therefore, summary judgment will be granted to defendant Benoit with regard to the malicious prosecution claim.

III.

Accordingly, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted. The Clerk may enter judgment and close the file.

So ordered this 31st day of March 2025.

_____/RNC/_____
                Robert N. Chatigny
                United States District Judge

14