# 25-1104

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

KEITH MASSIMINO,
*Plaintiff-Appellant*,

v.

MATTHEW BENOIT and FRANK LAONE,
*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Connecticut,
No. 21-cv-1132, Hon. Robert N. Chatigny, Senior District Judge

**[PROPOSED] BRIEF OF LATINOJUSTICE PRLDEF AS**
***AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT**

Andrew Case
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, N.Y. 10115
(212) 219-3360
acase@latinojustice.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICUS ....................................................................................1

PRELIMINARY STATEMENT.........................................................................2

ARGUMENT ......................................................................................................3

     I.     Recording Public Officials and the Forum Doctrine.............................3

     II.    The Second Circuit Should Take This Opportunity to Clearly
           Establish Standards for Reviewing Restrictions on the Right to Record
           Police. .......................................................................................................9

           A.     Restrictions on Newsgathering Are Always Subject to
                   Intermediate Scrutiny. ...............................................................11

           B.     Generally Applicable Regulations Should Be Subject to
                   Intermediate Scrutiny to the Extent they Interfere with the Right
                   to Record Law Enforcement. ....................................................14

           C.     Regulations Specifically Restricting the Right to Record Law
                   Enforcement Should be Subject to Strict Scrutiny. ..................18

     CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

## Cases

*ACLU of IL v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...........................................6, 17

*Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022).. 12, 23

*Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011)..................................9

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ....................................................... 13, 14

*Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530 (1980) ...................................................................................16

*Cornelius v. NAACP Leg. Def. Fund*, 473 U.S. 788 (1985) ...................................12

*Craig v. Boren*, 429 U.S. 190 (1976) .....................................................................12

*Deep S. Today v. Murrill*, No. 24-cv-623, 2025 WL 1214560 (M.D. La. Jan. 31, 2025) .......................................................................................................................19

*Fields v. City of Philadelphia*, 862 F. 3d 353 (3d Cir. 2017)....................................6

*Gaymon v. Borough of Collingdale*, 150 F. Supp. 3d 457 (E.D. Pa. 2015) ..............9

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014)...........................................................17

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ............................................................4

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ......15

*Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015) ..............7

*Hils v. Davis*, 52 F.4th 997 (6th Cir. 2022) ........................................................5, 10

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021) ...5

*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir 2010)........................................7

*Ligon v. City of New York*, 924 F. Supp. 2d 478 (S.D.N.Y. 2013) ............................1

*Mitchell v. City of New Haven*, 854 F. Supp. 2d 238 (D. Conn. 2012)...................20

*Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir.) ...................15

*Nicodemus v. City of South Bend*, 137 F.4th 654 (7th Cir. 2025) ...........................22

*People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir.) ......................................................................16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ................4

*Philadelphia Bail Fund v. Arraignment Ct. Magistrate Judges*, 440 F. Supp. 3d 415 (E.D. Pa. 2020) ..........................................................................................................6

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ...............................16

*Price v. Garland*, 45 F.4th 1059, 1071 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2432 (2023)...............................................................................................................10

*Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020)...............11, 18

*Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232 (S.D. Ohio 2019).14

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................................................23

*Reps. Comm. for Freedom of the Press v. Rokita*, No. 24-2927, 2025 WL 2218472 (7th Cir. Aug. 5, 2025)...........................................................................................22

*Reyes v. City of New York*, No. 23-cv-6369, 2024 WL 4354877, at *7 (S.D.N.Y. Sept. 30, 2024)................................................................................................1, 19

*Robb v. Hungerbeeler*, 281 F. Supp. 2d 989 (E.D. Mo. 2003), *aff'd,* 370 F.3d 735 (8th Cir. 2004)..........................................................................................................7

*Sharpe v. Winterville Police Dep't*, 59 F.4th 674 (4th Cir. 2023) ...........................18

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000) ......................................4

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994)...................................12, 14

*Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017)......................................4

*United States v. Yonkers Bd. of Educ.*, 747 F.2d 111 (2d Cir. 1984)........................5

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) .....................14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...................................4, 19, 20

## Statutes

N.Y. Civ. R. L. § 79-h ..............................................................12

## Other Authorities

David Murphy, Comment, *"V.I.P." Videographer Intimidation Protection: How the Government Should Protect Citizens Who Videotape the Police*, 43 SETON HALL L. REV. 319 (2013) ..............................................................8

*In Videos: Protests Against Police Violence Rage Across the U.S.*, N.Y. TIMES (June 6, 2020)..............................................................20

Jacob Rose, Note, *Codifying the Right to Record Police: National Challenges Demand a Congressional Solution*, 55 COLUM. HUM. RTS. L. REV. 974 (2024) ..2, 18

Kristi A. Nickodem and Kristina Wilson, *Responding to First Amendment "Audits" in the Local Government Context*, 141 UNC School of Government Local Government Law Bulletin (Nov. 2022)..............................................................8

Report on Tompkins Square Park Incident from Robert J. Johnson, Jr., Chief of Department, City of New York Police Department, to Benjamin Ward, Police Commissioner, City of New York Police Department Tompkins Square Park Incident (Aug. 23, 1988) (on file with Lloyd Sealy Library Digital Collections) ..............................................................21

RONALD J. KROTOSZYNSKI, JR., RECLAIMING THE PETITION CLAUSE (2012)............9

THOMAS PYNCHON, V. (1999)..............................................................20

## Rules

Fed. R. App. P. 29(a)(4)(E) ..............................................................1

## INTEREST OF AMICUS[1]

LatinoJustice PRLDEF ("LatinoJustice"), founded in 1972 as the Puerto Rican Legal Defense and Education Fund, is a national nonprofit civil rights organization that advocates for and defends the constitutional rights of Latinos. It represents SeanPaul Reyes in *Reyes v. New York*, No. 23-cv-6369 (S.D.N.Y.), a First Amendment challenge to the New York City Police Department's policy forbidding recording of police activity in the public lobbies of NYPD precincts, which has twice been before this Court.

In addition, LatinoJustice litigated *Ligon v. City of New York*, 924 F. Supp. 2d 478 (S.D.N.Y. 2013), and it actively participates in the federal-court monitorship of the NYPD. LatinoJustice has brought impact litigation to address discrimination against Latinos in a wide variety of other areas, including education, fair housing, immigrant rights, language rights, redistricting, and voting rights.

Because of its long history of advocating and litigating issues regarding policing practices, including particularly the right to record police activities,

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus* LatinoJustice states that no party's counsel authored this brief in whole or in part. No party, party's counsel, or other person unaffiliated with LatinoJustice contributed money intended to fund preparing or submitting this brief. In addition to undersigned counsel, Namratha Somayajula, a legal fellow whose admission is pending, and Ivanna Guerra, a legal summer intern, provided significant contributions to the brief.

LatinoJustice is particularly well-suited to weigh in on the First Amendment standards governing the right to record law enforcement.

## PRELIMINARY STATEMENT

Thirty years ago, George Holliday stood on his balcony and trained his Sony Camcorder across the street onto Foothill Boulevard, where seven LAPD officers viciously beat an unarmed and defenseless Rodney King after a traffic stop. Since then, civilian recordings have become one of the most important means of holding the police accountable. Such recordings captured Daniel Panteleo as he used an illegal chokehold to kill Eric Garner, Daniel Chauvin as he murdered George Floyd, and countless other officers abusing their authority.

By 2018, when Keith Massimino stood on a public sidewalk and recorded publicly-visible areas of the Waterbury police station, most circuit courts had recognized a right to record the police.[2] But they had done so, and some continue to do so, under different theories of the First Amendment. Mr. Massimino's arrest would have violated the First and Fourth Amendments under any of these standards, and his right was therefore "clearly established" at the time of the

---

[2] *See* Jacob Rose, Note, *Codifying the Right to Record Police: National Challenges Demand a Congressional Solution*, 55 COLUM. HUM. RTS. L. REV. 974, 992 (2024) (analyzing federal appellate decisions recognizing a right to record police, including in each of the six circuits that had considered the issue prior to 2018, and noting that "[a]ll circuits to address the issue have found that the Constitution protects the right to record police performing their duties in public").

incident. LatinoJustice writes to set forth the benefits and drawbacks of the various analytic frameworks circuit courts have used and recommend one framework to this Court so that the law may be further clarified and embedded in Second Circuit doctrine going forward.

LatinoJustice's proposed standard is as follows: first, any regulation or law of general applicability should be evaluated under intermediate scrutiny to the extent that it infringes upon a person's right to record law enforcement in the execution of their official duties, wherever that recording takes place; and second, any enforcement action—whether law, regulation, or arrest—taken because a person was recording law enforcement specifically is subject to strict scrutiny. This approach rejects the application of the forum doctrine, which can produce erratic results. Instead, it provides a flexible framework using well-established First Amendment principles.

## ARGUMENT

## I.      Recording Public Officials and the Forum Doctrine

Courts considering regulations restricting the right to record public officers or officials, including the police, have often applied the forum doctrine, using a different standard of review based on the nature and use of the government property where the activity took place. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). For example, in *Smith v. City of*

*Cumming*, the Eleventh Circuit held that the right to record police "on public property" was "subject to reasonable time, manner and place restrictions." 212 F.3d 1332, 1333 (11th Cir. 2000). And the First Circuit, in ruling in favor of a right to record, emphasized that a plaintiff had "filmed the defendant police officers in the Boston Common, the oldest city park in the United States and the apotheosis of a public forum." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (a right to record the police is "subject only to reasonable time, place, and manner restrictions"); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (confirming that "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech").

The Seventh Circuit used forum analysis to determine that reporters could be excluded from an invitation-only press conference because the press conference itself was in a non-public forum, and therefore the infringement on their right to record that press conference was reasonable. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021). The Sixth Circuit recently analyzed whether a police officer subject to a disciplinary investigation had the right to record the investigator interviewing him "through the lens of whether the Authority's investigation occurs in a public forum or nonpublic forum." *Hils v. Davis*, 52 F.4th 997, 1003 (6th Cir. 2022).

The Second Circuit has held that a restriction on recording court proceedings is a "'time, place, and manner' restriction, which should not be subjected to strict scrutiny, but should be upheld if reasonable." *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 114 (2d Cir. 1984) (citations omitted). But this decision partly relied on the fact that transcripts of the proceedings were already available and provided an alternate means of obtaining the information. Other courts have affirmed a First Amendment right to record bail hearings when there are "no transcripts and no official court reporter system to undermine." *Philadelphia Bail Fund v. Arraignment Ct. Magistrate Judges*, 440 F. Supp. 3d 415, 423 (E.D. Pa. 2020).

Even courts that have recognized the distinction between speech and information gathering have emphasized the "public" nature of a recording and the "public" nature of a police officer's duty when analyzing restrictions on the right to record. *See ACLU of IL v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) (considering challenge to recording statute as applied to "openly recording what police officers say while performing their duties in traditional public fora"). And while *Fields v. City of Philadelphia* properly situates the right to record police within the "public's right of access to information about their officials' public activities," it says little

-5-

about "the limits of this constitutional right" or what test should be applied to each type of restriction. 862 F. 3d 353, 360 (3d Cir. 2017).[3]

And the most relevant case to the question of qualified immunity from a district court in this circuit also emphasized the public nature of the recording. *See Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015). Like other cases, when discussing the right, the *Higginbotham* court described it as the right to "record police activity in public." The court's opinion invokes the language of forum analysis without conducting such analysis, perhaps because so many of the relevant cases took place, as Mr. Massimino's did, on sidewalks and in parks. *See id.* (collecting cases).

By 2022, forum analysis had been so ingrained as a means of analyzing restrictions on recording law enforcement that the University of North Carolina School of Government issued a sixty-six-page legal bulletin offering guidance for

---

[3] Seven years before deciding *Fields*, the Third Circuit had concluded that the right to record police had not been established during "inherently dangerous situations" such as traffic stops. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262–63 (3d Cir 2010). *But see Robb v. Hungerbeeler*, 281 F. Supp. 2d 989, 1000 (E.D. Mo. 2003), *aff'd,* 370 F.3d 735 (8th Cir. 2004) ("[T]he shoulders of highways are certainly not traditional public fora, such as streets or parks.")

state and local governments, founded entirely on regulating police recording as subject to forum analysis as though it were expressive activity.[4]

But, for reasons that have become increasingly clear as recording law enforcement becomes more common, the forum doctrine is ultimately unsatisfying as a means of judging restrictions on recording law enforcement. After all, a person making a recording is not engaged in expression; they are collecting information that they may or may not choose to disclose later.[5] Police operate in public and

---

[4] *See* Kristi A. Nickodem & Kristina Wilson, *Responding to First Amendment "Audits" in the Local Government Context*, 141 UNC SCHOOL OF GOVERNMENT LOCAL GOVERNMENT LAW BULLETIN 25 (Nov. 2022) ("Generally, local governments should assume that courts will treat streets, sidewalks, plazas, town squares, parks, and other outdoor areas dedicated to assembly or general pedestrian passage as traditional public forums.").

[5] While courts have often treated recording as an antecedent to speech, the purpose for which information is gathered through a recording and the way it is ultimately used may inform under which First Amendment clause it is best analyzed. *See, e.g.*, David Murphy, Comment, *"V.I.P." Videographer Intimidation Protection: How the Government Should Protect Citizens Who Videotape the Police*, 43 SETON HALL L. REV. 319, 324 (2013) (arguing that information gathering should be analyzed under the Petition Clause if for the purpose of "resol[ving] legal disputes [or] for the general purposes of self-governance"); *see also Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2490 (2011) (acknowledging in dicta that "cases might arise in which special Petition Clause concerns would require a distinct analysis" from that used under the Speech Clause). For an in-depth analysis of the Petition Clause's distinctness from the Speech Clause, see RONALD J. KROTOSZYNSKI, JR., RECLAIMING THE PETITION CLAUSE 183 (2012) (discussing, in the context of the Petition Clause, the public's right to seek redress of grievances on a public sidewalk and noting that "any restrictions [on such activity] proximate to government officials should be justified by actual—as opposed to merely hypothetical—risks, and . . . the

private spaces, and it is illogical to accept that the right to record an officer's action

should depend on the nature of the property where that action takes place.

Common sense dictates and case law supports, for example, that a person has the

right to record officers in their own home, a private space where the government

has no role in regulating speech. *See Gaymon v. Borough of Collingdale*, 150 F.

Supp. 3d 457, 462 (E.D. Pa. 2015) (denying qualified immunity to officers who

arrested a person for recording them on her property and in her home).

Many courts have repeated the language that the First Amendment protects

the right to record police executing their duties "in public" without defining what

"public" means. Imagine a political rally at a rented private auditorium. Does the

First Amendment protect the right to record police arresting someone at such an

event? Does it protect the right to record officers apprehending a bank robber, even

though the officers are, in some sense, not executing their duties "in public"? Do

you have the right to record an officer interviewing you in connection to a criminal

investigation? Why would that depend on where the interview takes place? Nor is

it particularly clear that an officer subject to an investigation for a fatal shooting

should be able to record his own interactions with those who interview him right

---

government should be required to use the least restrictive means possible to address
those security concerns").

after the incident in a public park but not at a subsequent interview in a precinct. *See Hils*, 52 F.4th at 1003.

As it looks to "clearly establish" the law on the right to record law enforcement going forward, this Circuit should adopt a clear yet adaptable test, which is rooted in First Amendment principles but does not rely on the status of the property where either the person recording or the officer being recorded is located. One such test is set forth in the next section.

## II.     The Second Circuit Should Take This Opportunity to Clearly Establish Standards for Reviewing Restrictions on the Right to Record Police.

The contours of a straightforward and forum-neutral test can be drawn from the growing consensus among other circuits. In *Price v. Garland*, the District of Columbia Circuit analyzed cases concerning "the narrow[] 'right to gather information about what public officials do on public property.'" *Price v. Garland*, 45 F.4th 1059, 1071 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2432 (2023). Recognizing that none of the cases extended traditional forum analysis to this context, it explained that "[b]ecause prohibiting the recording of a public official performing a public duty on public property is unreasonable, the specific nature of the public property is irrelevant." *Price*, 45 F.4th at 1071. The *Price* court distinguished between activity related to the communication or expression of speech and that related to its creation, like videotaping. The language in *Price*,

-9-

though dicta, emphasizes the growing consensus that the forum analysis has no role to play in protecting the right to record law enforcement.

That consensus analyzes interference with the right to record law enforcement as follows. First, any generally applicable law that interferes with the right to record police is subject to intermediate scrutiny as applied to recording the police. *See Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 822 (1st Cir. 2020) (striking down a generally applicable eavesdropping statute as applied to recording the police under intermediate scrutiny). Even if the recording takes place in a non-public forum, or on private property, no infringement of the right to record law enforcement can be upheld under the more relaxed standard under the forum doctrine that it be merely "reasonable." *Cornelius v. NAACP Leg. Def. Fund*, 473 U.S. 788, 789 (1985) (concluding that, where forum analysis applies, "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*") (emphasis in original).

Instead, restrictions on recording should always be subjected to at least intermediate scrutiny: they must be "substantially related" to furthering "important governmental objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Turner Broad. Sys.*, *Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) (applying intermediate scrutiny in the context of the First Amendment).

-10-

Second, any enforcement action—whether regulation, law, or individual arrest—specifically restricting recording of law enforcement is subject to strict scrutiny. *See Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1106 (D. Ariz. 2022) (striking down a law that specifically criminalized recording police officers from within eight feet away under strict scrutiny as a kind of content-based discrimination). Additionally, as set forth below, there should be no lesser burden on so-called "time, place, and manner" restrictions when it comes to recording the police because such restrictions are inherently substantive with regard to newsgathering in ways they are not when applied to expression.

## A. Restrictions on Newsgathering Are Always Subject to Intermediate Scrutiny.

In 1972, the United States Supreme Court rejected the idea that the First Amendment created a so-called "reporters' privilege" that journalists could assert to grand juries to keep avoid being forced to disclose the identities of confidential sources. *Branzburg v. Hayes*, 408 U.S. 665 (1972). The Court agreed with the plaintiff reporter that the First Amendment protected newsgathering to some extent, because "without some protection for those seeking out the news, freedom of the press could be eviscerated." *Id.* at 682. But it disagreed that this merited creating a new privilege. After all, it reasoned, the government has a significant interest in grand jury proceedings and other private citizens had to testify, even about secrets. *Id.* Furthermore, even though "the infringement of protected First

-11-

Amendment rights must be no broader than necessary to achieve a permissible governmental purpose," there was no indication of a fishing expedition or a targeting of a particular reporter for their speech. *Branzburg*, 408 U.S. at 699.[6]

The language of *Branzburg* closely tracks the language of intermediate scrutiny—the test of whether a restriction serves an "important or substantial governmental interest" and whether it is tailored so that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys.*, *Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). Courts considering the newsgathering right in other contexts have likewise applied heightened scrutiny to laws and regulations restricting it. For example, a law prohibiting people from joining political campaigns for the purpose of reporting secret internal communications was subject to intermediate scrutiny for the imposition it placed on the newsgathering right. *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 258 (S.D. Ohio 2019). And the Fifth Circuit recently did the same in analyzing an aerial-eavesdropping statute. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 790 (5th Cir.), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140

---

[6] Of course, this Circuit had recognized a reporter's privilege prior to *Branzburg* and continues to do so now, both as constitutional matter and in New York State, by statute. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987); N.Y. Civ. R. L. § 79-h.

(2024). Considering whether a statute prohibiting people from recording over private homes with aerial drones violated the First Amendment, it found that because "the government has a substantial interest in protecting the privacy rights of its citizens," and that because the law was "tailored to bar only surveillance that could not be achieved through ordinary means" and excluded public property entirely, it withstood intermediate scrutiny. *Id.* at 794.

Of course, content-based restrictions on the right to gather news are subject to strict scrutiny just as other content-based restrictions are under the First Amendment. For example, rules barring reporters from attending an otherwise public trial based on which witnesses are testifying are subject to strict scrutiny. *See, e.g.*, *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982). And while a regulation barring employees from recording their workplace conditions may not trigger strict scrutiny, one that specifically targets using those recordings to make a particular type of speech does. *People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir.), *cert. denied,* 144 S. Ct. 325 (2023), and *cert. denied sub nom. Stein v. People for the Ethical Treatment of Animals, Inc.*, 144 S. Ct. 326 (2023) ("Yet a journalist who *conducts* herself in the exact same manner but *speaks out against* the employer would face heavy penalties.").

This framework aligns with the general First Amendment principle that "[g]overnmental action that regulates speech on the basis of its subject matter slips from the neutrality of time, place, and circumstance into a concern about content." *Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530 (1980) (quoting *Police Department of Chicago v. Mosley*, 408 U.S. 92, 99 (1972)). Thus, a ready-made test for considering restrictions on newsgathering already exists: laws of general applicability are subject to intermediate scrutiny to the extent that they impede newsgathering and content-based laws restricting newsgathering are subject to strict scrutiny.

**B.      Generally Applicable Regulations Should Be Subject to Intermediate Scrutiny to the Extent they Interfere with the Right to Record Law Enforcement.**

Seen through the above lens, the various cases addressing the right to record law enforcement demonstrate a consensus. For example, the Seventh Circuit drew from newsgathering caselaw and precedent involving commercial speech to apply "intermediate scrutiny" to a generally applicable wiretapping statute as applied to those "who openly record police officers performing their official duties in public," although there was public fora language throughout the decision. *Alvarez*, 679 F.3d at 604–05.

When considering whether an individual has a right to record their own traffic stop, the First Circuit noted that in the absence of any particular

-14-

restriction—whether in the form of "a reasonable, contemporaneous order from a police officer, or a preexisting statute, ordinance, regulation, or other published restriction with a legitimate governmental purpose"—the right to record police was "unfettered." *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014). When such a restriction was later enacted, the First Circuit detailed the caselaw on recording police and gathering news and concluded that it was appropriate to apply intermediate scrutiny to general regulations as applied to the right to record police. *See Project Veritas Action Fund*, 982 F.3d at 835.[7] Because the law at issue was a generally applicable statute barring audio recording anyone without their knowledge, the court applied intermediate scrutiny as applied to recording police officers conducting their duties. *Id.* at 835–36. Moreover, it used an expansive understanding of what it means for officers to perform their duties in "public," extending it to "locales to which the public generally has access to collect information" rather than restricting it to public fora or even public property. *Id.*

The Fourth Circuit recently applied what a concurrence described as "a traditional, freestanding First Amendment analysis" when it stated that a policy forbidding livestreaming traffic stops should only be upheld if "(1) the Town has

---

[7] *See also* Rose, *supra* note 2, at 987 (explaining that in *Project Veritas*, the First Circuit "[f]or the first time . . . explicitly discussed the appropriate level of scrutiny for content-neutral restrictions on the right to record, stating forum analysis was not key to resolving the issue").

weighty enough interests at stake; (2) the policy furthers those interest; and (3) the policy is sufficiently tailored to furthering those interests." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 688 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 488, 217 L. Ed. 2d 256 (2023), and *cert. denied,* 144 S. Ct. 489 (2023). And earlier this year the Middle District of Louisiana stated that intermediate scrutiny was the appropriate test to apply to a "generally applicable regulation of conduct" challenged to the extent that it interfered with the recording of law enforcement. *Deep S. Today v. Murrill*, No. 24-cv-623, 2025 WL 1214560, at *20 (M.D. La. Jan. 31, 2025).

Late last year, the Southern District of New York, considering much of the argument set forth above, concluded that an NYPD rule barring all audio and video recording in the lobbies of NYPD precincts, which are otherwise held open to the public, was properly reviewed under intermediate scrutiny rather than by conducting a forum analysis of police precinct lobbies. *Reyes v. City of New York*, No. 23-cv-6369, 2024 WL 4354877, at *7 (S.D.N.Y. Sept. 30, 2024). The court denied a motion to dismiss because "[i]n terms of whether the Procedure is narrowly tailored to serve a significant government interest, the Court cannot reach such a conclusion without discovery." *Id.*

Application of intermediate scrutiny to regulations restricting the right to record police officers regardless of forum is particularly delicate when considering

-16-

so-called "time, place, and manner" restrictions. *Ward*, 491 U.S. at 791. While these restrictions are permissible when "reasonable," to be reasonable they must also be "narrowly tailored to serve the government's legitimate, content-neutral interests." *Id.* A bar on recording that may otherwise be "reasonable" could very well be unreasonable as applied to recording police.

For example, one of the most familiar "time" restrictions is the fact that the government may close parks in the evening, even though they are public fora. In *Mitchell v. City of New Haven*, for example, the District of Connecticut found that a restriction barring activists from using a park at night was a reasonable time, place, and manner restriction because demonstrators were "being required to alter only the time, place, or manner of their protest—not, by any means, to stop protesting entirely." 854 F. Supp. 2d 238, 255 (D. Conn. 2012) .

But a regulation forbidding people from recording police at night would be absurd.[8] Unlike expression, the newsgathering right must be exercised precisely when and where the news is taking place in order to have any meaning at all. Forbidding people from recording police in a park at night would have prevented the public from seeing the video of officers clearing Tompkins Square Park by

---

[8] *See, e.g.*, *In Videos: Protests Against Police Violence Rage Across the U.S.*, N.Y. TIMES (June 6, 2020); THOMAS PYNCHON, V. 246 (1999) ("History, the proverb says, is made at night. The European civil servant normally sleeps at night. What waits in his IN basket to confront him at nine in the morning is history.").

using indiscriminate force against unarmed civilians—one of the significant events that led to the creation of the New York City Civilian Complaint Review Board.[9]

Therefore, while the "traditional, freestanding First Amendment analysis" is appropriate to apply to general regulations to the effect they implicate the right to record the police, time and place restrictions are more sensitive to failing that analysis than they are in the expressive context.

### C.     Regulations Specifically Restricting the Right to Record Law Enforcement Should be Subject to Strict Scrutiny.

As with any regulation that infringes on First Amendment activity, of course, laws and rules that *specifically* infringe on the right to record law enforcement must be subjected to strict scrutiny. This distinction helps explain why the Seventh Circuit applied intermediate scrutiny to an Indiana law allowing police to order any person who stepped within a twenty-five-foot "buffer zone" of an on-duty officer to stop approaching, while the District of Arizona found that a law forbidding people from recording law enforcement from closer than eight feet was subject to

---

[9] In a report on the Tompkins Square Park incident, Chief of Department Robert J. Johnson wrote that officers attempted to "conceal their identity by covering or removing their shields" while they were "kicking apparently defenseless people while they were lying on the ground." Report on Tompkins Square Park Incident from Robert J. Johnson, Jr., Chief of Department, City of New York Police Department, to Benjamin Ward, Police Commissioner, City of New York Police Department Tompkins Square Park Incident (Aug. 23, 1988) (on file with Lloyd Sealy Library Digital Collections).

strict scrutiny. *See Nicodemus v. City of South Bend*, 137 F.4th 654, 665 (7th Cir. 2025); *Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1106 (D. Ariz. 2022). Because Indiana's "buffer zone" statute permitted law enforcement to prevent *anyone* from coming within twenty-five feet of an on-duty officer, for any reason, it did not single out people who are recording the police and was therefore analyzed as a "manner" restriction. *Nicodemus*, 137 F.4th at 665.[10] But the Arizona regulation "singles out the activity of video recording law-enforcement activity." *Brnovich*, 626 F. Supp. 3d at 1106. It forbade recording police officers from closer than eight feet but did not forbid recording anyone or anything else. Since such a law necessarily "singles out specific subject matter for differential treatment," it is subject to strict scrutiny. *Id. quoting Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

This framework likewise helps resolve arrests like Mr. Massimino's, where a person is arrested for trespassing, disorderly conduct, or obstructing governmental administration. Such actions, when taken specifically because a person is recording law enforcement, are subject to strict scrutiny just as a law specifically targeting

---

[10] The Seventh Circuit subsequently found that the law was void for vagueness precisely because of the degree of discretion it provided to individual officers. *See Reps. Comm. for Freedom of the Press v. Rokita*, No. 24-2927, 2025 WL 2218472, at *1 (7th Cir. Aug. 5, 2025)

recording law enforcement would be. Thus, because Mr. Massimino was arrested specifically for recording police buildings and officers, he was subject to a content-based enforcement action like the one in *Brnovich*. He would not have been arrested had he stood at the same place and aimed his camera at a nearby home. The enforcement action was therefore content-based and subject to strict scrutiny now, just as it would have been under a forum doctrine analysis in 2018.

Regardless of how this Court conceptualizes the state of the law in 2018 as applied to Mr. Massimino's arrest, it now has the opportunity to establish the clear, adaptable standards future district courts will use to evaluate restrictions on the right to record law enforcement and should do so as set forth above.

## CONCLUSION

For the reasons stated above, amicus respectfully requests that this Court clearly establish that laws and regulations of general applicability are subject to intermediate scrutiny to the extent they interfere with the right to record law enforcement and that any law specifically restricting the right to record law enforcement is subject to strict scrutiny.

Respectfully submitted,

Dated:        August 18, 2025

Andrew Case
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, N.Y. 10115

-20-

(212) 219-3360
acase@latinojustice.org

*Attorneys for Amicus Curiae*
*LatinoJustice PRLDEF*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this brief:

(i)    complies with the word limit of Rules 29(a)(5), which provides that an amicus brief may contain half the words of a principal brief under 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), this document contains 5,623 words, which is less than half of the 13,000 words permitted under Rule 32(a)(7)(B); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and Rule 32(a)(6).

Dated:       August 18, 2025             /s/ *Andrew Case*_____
                                                         Andrew Case
                                                         LatinoJustice PRLDEF
                                                         475 Riverside Drive
                                                         New York NY 10015

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 18, 2025 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I CERTIFY that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/  <em>Andrew Case</em>    </u><br>Andrew Case