25-1104
*Massimino v. Benoit*

# In the United States Court of Appeals for the Second Circuit

August Term 2025
Argued: March 2, 2026
Decided: August 17, 2026

No. 25-1104

KEITH MASSIMINO,
*Plaintiff-Appellant*,

v.

MATTHEW BENOIT, FRANK LAONE,
*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Connecticut
No. 21-cv-1132, Robert N. Chatigny,
District Judge.

Before: RAGGI, PÉREZ, and MERRIAM, *Circuit Judges*.

Keith Massimino alleges that two police officers—Matthew Benoit and Frank Laone—violated his rights under the First and Fourth Amendments to the United States Constitution when they detained and arrested him while he recorded the exterior of the Waterbury Police Department building from a public sidewalk. He argues that the First Amendment protects his right to record law

enforcement activity in public, and that this right encompasses recording a police department building from a public sidewalk. Thus, he contends, Benoit and Laone lacked any reasonable basis to detain, arrest, and prosecute him. On competing summary judgment motions, the District Court ruled in favor of the officers on all of Massimino's claims. We affirm.

We begin by joining a growing chorus of our sister circuits that have recognized a First Amendment right to record law enforcement activity in public. That right encompasses Massimino's recording of the exterior of a police station from a public sidewalk. However, because that right was not clearly established at the time in question, Benoit and Laone are entitled to qualified immunity as to Massimino's First Amendment claim.

Next, although Massimino engaged in First Amendment-protected activity, we nevertheless conclude that Benoit and Laone had reasonable suspicion to briefly detain and question him. Massimino's subsequent failure to comply with the officers' order that he produce identification afforded the officers probable cause to believe Massimino had violated Conn. Gen. Stat. § 53a-167a. These related conclusions defeat Massimino's Fourth Amendment claims concerning his detention and arrest. Because the officers had probable cause to arrest Massimino, and there was probable cause to continue at each stage of the prosecution, Massimino cannot maintain a malicious prosecution claim either.

Judge Raggi concurs in a separate opinion.

---

DAN BARRETT (Elana Bildner, Jaclyn Blickley, *on the brief*), American Civil Liberties Union Foundation of Connecticut, Hartford, CT, *for Plaintiff-Appellant.*

JOSEPH A. MENGACCI (Daniel J. Foster, *on the brief*), Office of the Corporation Counsel, Waterbury, CT, *for Defendants-Appellees*.

---

MYRNA PÉREZ, *Circuit Judge*:

Keith Massimino alleges that two police officers—Matthew Benoit and Frank Laone—violated his rights under the First and Fourth Amendments to the United States Constitution when they detained and arrested him while he recorded the exterior of the Waterbury Police Department building from a public sidewalk. He argues that the First Amendment protects his right to record law enforcement activity in public, and that this right encompasses recording a police department building from a public sidewalk. Thus, he contends, Benoit and Laone lacked any reasonable basis to detain, arrest, and prosecute him. On competing summary judgment motions, the District Court ruled in favor of the officers on all of Massimino's claims. We affirm.

We begin by joining a growing chorus of our sister circuits that have recognized a First Amendment right to record law enforcement activity in public. That right encompasses Massimino's recording of the exterior[1] of a police station from a public sidewalk. However, because that right was not clearly established

[1] Exterior, as it is used throughout this opinion, means the areas visible from a publicly accessible area outside the police station.

at the time in question, Benoit and Laone are entitled to qualified immunity as to Massimino's First Amendment claim.

Next, although Massimino engaged in First Amendment-protected activity, we nevertheless conclude that Benoit and Laone had reasonable suspicion to briefly detain and question him. Massimino's subsequent failure to comply with the officers' order that he produce identification afforded the officers probable cause to believe Massimino had violated Conn. Gen. Stat. § 53a-167a. These related conclusions defeat Massimino's Fourth Amendment claims concerning his detention and arrest. Because the officers had probable cause to arrest Massimino, and there was probable cause to continue at each stage of the prosecution, Massimino cannot maintain a malicious prosecution claim either.

## BACKGROUND

### I. Massimino's Detention and Arrest

Keith Massimino is a self-described "First Amendment auditing hobbyist." Appellant's Br. at 3. On the evening of October 30, 2018, he conducted a so-called "First Amendment audit" outside the Waterbury Police Department in Waterbury, Connecticut. The "audit" consisted of Massimino walking around the

exterior of the police station recording a video of the station and its surrounding areas. These areas included the closed door of the entrance to the "Youth Division" and the first level of an open-air parking garage attached to the police station containing police vehicles. At all times, Massimino remained on a public sidewalk.

After Massimino had been recording for roughly six and a half minutes, Officers Matthew Benoit and Frank Laone approached and questioned him. Massimino said that he was "a journalist getting content for a story" but declined to answer the officers' follow-up questions. Benoit and Laone told Massimino he was not allowed to videotape the police station and requested he produce identification. They expressed concern that Massimino could be planning some kind of attack on the building. When Massimino refused to provide identification, the officers asserted that their request was "a lawful order." Massimino again refused to produce identification, and the officers arrested him.

Massimino was charged with violating Conn. Gen. Stat. § 53a-167a, which prohibits certain acts of interference with police activity, such as "obstruct[ing], resist[ing], hinder[ing] or endanger[ing] any peace officer . . . in the performance

of such peace officer's . . . duties." He was held for several hours and then released. The lone charge against Massimino was ultimately dismissed roughly two and a half years later. *See State v. Massimino*, No. U04W-CR18-0454740-S (Conn. Super. Ct. May 21, 2021).

## II. Procedural History

Massimino brings three claims against Benoit and Laone pursuant to 42 U.S.C. § 1983: (1) a First Amendment claim for violating his right to record the police station; (2) a Fourth Amendment claim for detaining and subsequently arresting him; and (3) a malicious prosecution claim. The officers assert they are entitled to qualified immunity as to all of Massimino's claims. The parties cross-moved for summary judgment, and the District Court granted the officers' motion.

The District Court concluded that the officers were entitled to qualified immunity as to Massimino's First Amendment claim, and to summary judgment on the merits of the Fourth Amendment claims. *See Massimino v. Benoit*, No. 3:21-cv-1132, 2025 WL 975177, at *2–5 (D. Conn. Mar. 31, 2025). On the First Amendment claim, the District Court concluded that Massimino lacked a clearly established right to record the police station. *Id.* at *2–3. On the Fourth

Amendment claims, it determined that the officers had reasonable suspicion to effect an investigative detention. *Id.* at *3–4. It further concluded that the officers had at least arguable probable cause to arrest Massimino based on his failure to comply with the lawful order to produce identification. *Id.* at *4–5. Lastly, the District Court granted summary judgment in favor of Benoit and Laone on Massimino's malicious prosecution claim. *Id.* at *5. Massimino now appeals.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review *de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Roth v. Armistice Cap., LLC*, 151 F.4th 21, 25–26 (2d Cir. 2025). We likewise review "*de novo* where the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other." *Suluki v. Credit One Bank, NA*, 138 F.4th 709, 719 (2d Cir. 2025) (quoting *Zhang Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021)). "We evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)).

## DISCUSSION

### I. First Amendment

Because Benoit and Laone assert a qualified immunity defense to Massimino's First Amendment claim, Massimino's burden is to "show '(1) that [Benoit and Laone] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Russell v. Scott*, 170 F.4th 83, 93 (2d Cir. 2026) (citation modified) (quoting *Nat'l Rifle Ass'n of America v. Vullo*, 144 F.4th 376, 389 (2d Cir. 2025)). We take these two prongs in

turn. *See id.* ("We have discretion to consider either of the two qualified immunity prongs first.").[2]

Benoit and Laone violated Massimino's First Amendment right to record publicly visible areas of a police station from a public sidewalk. However, this right was not clearly established at the time of the challenged incident. Thus, they are entitled to qualified immunity on this claim.

**A. The Right to Record**

Massimino argues that the First Amendment protects his right to record publicly visible areas of a police station from a public sidewalk. We agree. That conclusion follows from a broader First Amendment principle: the Constitution protects the right to record law enforcement activity in public. We therefore begin

---

[2] Although courts often resolve qualified immunity cases solely on the clearly established prong, the Supreme Court has recognized that "it is often beneficial" to decide both questions because doing so "promotes the development of constitutional precedent" and provides guidance in areas unlikely to arise outside qualified immunity litigation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). On more than one occasion, this Court has recognized that benefit. *See, e.g.*, *Francis v. Fiacco*, 942 F.3d 126, 140–41 (2d Cir. 2019); *Cugini v. City of New York*, 941 F.3d 604, 611 (2d Cir. 2019); *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 n.3 (2d Cir. 2021). As *Fiacco* explained, deciding the constitutional question in the appropriate case helps establish controlling law, guide public officials, and avoid allowing potentially unconstitutional conduct to persist indefinitely simply because qualified immunity repeatedly bars relief. *See* 942 F.3d at 140–41; *see also Camreta v. Greene*, 563 U.S. 692, 704–07 (2011). This is such a case. The asserted right governs interactions between members of the public and law enforcement, and resolving the constitutional question provides guidance to lower courts, officers, and the public. Our holding, however, is limited to the conduct and restriction presented here.

by addressing that more general question before turning to the narrower right asserted here.

Our circuit has so far declined to address whether the First Amendment protects a right to record law enforcement activity in public. *See Reyes v. City of New York*, 141 F.4th 55, 72 n.16 (2d Cir. 2025); *see also Reyes v. City of New York*, No. 23-7640, 2026 WL 2263365, at *2 n.2 (2d Cir. Aug. 6, 2026). Eight of our sister circuits have recognized that right. *See Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017); *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 680–81 (4th Cir. 2023); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *American C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 594–95 (7th Cir. 2012); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). Today, we join them.

1. <u>The Right to Record Law Enforcement Activity in Public</u>

The right to record law enforcement activity in public emerges from three foundational First Amendment principles. First, the First Amendment protects the *creation* of speech, not just the immediate act of expression. Second, speech on

matters of public concern—and particularly discussion of governmental affairs—lies at the heartland of the First Amendment's protections. Finally, the First Amendment protects the public's right to gather and access information about the government. We take each principle in turn.

The First Amendment protects the acts of "creating, distributing, or consuming speech" in equal measure. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). In other words, the First Amendment encompasses the entire "speech process," and therefore extends far beyond the precise moment of expression. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (explaining that both "the creation *and* dissemination of information are speech within the meaning of the First Amendment" (emphasis added)). Necessarily so. Otherwise, "[i]t would make permissible the prohibition of printing or selling books—though not the writing of them." *Brown*, 564 U.S. at 792 n.1; *see also Upsolve, Inc. v. James*, 155 F.4th 133, 141 (2d Cir. 2025).

This principle confirms that video recording falls within the protection of the First Amendment, at least as a general matter. Viewing, possessing, and

distributing videos are acts protected by the First Amendment. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952) (concluding "that expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments"). A necessary antecedent to those acts is recording a video in the first place; to distribute a recording, one must first create a recording. Thus, creating a recording is part of the speech process. *See Alvarez*, 679 F.3d at 596 ("[T]here is no fixed First Amendment line between the act of creating speech and the speech itself . . . ."); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010) ("Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation.").

When the government prevents a person from recording a video, it prohibits that person from possessing, viewing, and disseminating that video. *See Alvarez*, 679 F.3d at 595 ("The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected . . . ."); *cf. Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592–93 (1983) (finding that a tax on the use of ink

and paper in publications implicates the First Amendment). And when the government does so based on the content of the recording—for instance, because the recording depicts law enforcement activity—the government implicates the "most basic" First Amendment principle: "As a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790–91 (alterations in original) (quoting *Ashcroft v. American C.L. Union*, 535 U.S. 564, 573 (2002)). Thus, the First Amendment protects the creation of a video depicting law enforcement activity in public.

That right rests on a second independent foundation as well. It is anchored in the bedrock principle "that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)); *see Turner*, 848 F.3d at 689 ("In addition to the First Amendment's protection of the broader right to film, the principles underlying the First Amendment support the particular right to film the police.").

There has long been "practically universal agreement that a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). In the daily lives of many Americans, "governmental affairs" is not an abstract concept; it is a badge and a uniform. When a citizen records public police activity, she creates speech concerning the state's most immediate instrument for enforcing its laws. Speech of this kind "is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)).

Lastly, the right to record law enforcement activity in public vindicates "the paramount public interest in a free flow of information to the people concerning public officials, their servants." *Garrison*, 379 U.S. at 77. As the Supreme Court has explained, "the First Amendment . . . prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978); *see also Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to

social, political, esthetic, moral, and other ideas and experiences which is crucial here."); *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 296 (2d Cir. 2012).

Indeed, the First Amendment "has a *structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J., concurring). "Implicit in this structural role is . . . the antecedent assumption that valuable public debate—as well as other civic behavior—must be informed." *Id.* As we have explained, "it is essential that the people themselves have the ability to learn of, monitor, and respond to the actions of their representatives and their representative institutions." *United States v. Greenwood*, 145 F.4th 248, 254 (2d Cir. 2025) (quoting *United States v. Erie County*, 763 F.3d 235, 239 (2d Cir. 2014)).

The right to record law enforcement activity in public fits squarely within these three principles.[3] As the First Circuit has reasoned, "[a]n important corollary to th[e] interest in protecting the stock of public information is that '[t]here is an

---

[3] We also note that, in more than one sense, the very act of recording a video may sometimes itself be an act of expression. First, for some, that act may be intended to communicate their views about the subject of the recording or the constitutional protections afforded to their conduct. Second, when a person uses their phone to livestream a video, rather than record a video for later distribution, they are both recording and disseminating that video at the same time. In other words, often there is not even a "speech process." There is just speech. However, we need not decide the outer bounds of recording a video as speech here.

undoubted right to gather news from any source by means within the law.'" *Glik*, 655 F.3d at 82 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)). Recording law enforcement activity in public exercises that right.

We do not doubt that being recorded and exposed to public view while on the job may place added strain on the challenging job of law enforcement. But "[t]he risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967). That is doubly true for law enforcement officers who serve, and wield tremendous power over, the very public seeking to record them as they perform their duties. *See Glik*, 655 F.3d at 82–83; *cf. Nieves v. Bartlett*, 587 U.S. 391, 434 (2019) (Sotomayor, J., dissenting) ("The power to constrain a person's liberty is delegated to law enforcement officers by the public in a sacred trust. The First Amendment stands as a bulwark of that trust, erected by people who knew from personal experience the dangers of abuse that follow from investing anyone with such awesome power.").

For these reasons, the First Amendment protects the right to record law enforcement activity in public.

2. The Right to Record Video of a Police Station

Benoit and Laone argue, and the District Court agreed, that even if the First Amendment protects the right to record law enforcement activity in public, that protection does not extend to recording the exterior of a police station. Specifically, they contend that certain areas within Massimino's line of sight were sensitive and non-public, thereby placing them outside the First Amendment's protection. This argument misses the mark for two reasons. First, it is undisputed that everything Massimino recorded was plainly visible to any passerby on the public sidewalk or street. Second, because the right to record publicly visible areas of a police station from a public sidewalk derives from the broader right to record law enforcement activity in public, the same First Amendment principles

discussed above apply here. Those principles encompass Massimino's recording of the publicly visible areas of the Waterbury Police Department building.[4]

Massimino may have recorded some areas of the building that were not open to the public *to enter*. But Massimino has not claimed a right to physical access. Instead, he claims a right to record and disseminate what was in plain view from the public sidewalk—what any passerby standing in the same location could have observed. Those areas were exposed to ordinary observation by Massimino and any other passerby on the unrestricted public sidewalk.[5]

Benoit and Laone directly burdened Massimino's speech because they "prohibit[ed] [him] from conveying information that [he] already possesse[d]." *Sorrell*, 564 U.S. at 568 (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*,

---

[4] The concurring opinion describes this case as involving "very little 'activity' of any kind, much less 'law enforcement activity.'" Concurring Op. at 3. We understand the case somewhat differently. The First Amendment right at issue here is the right to record the publicly visible areas of a police station from a public sidewalk. As explained above, we conclude that this right derives from, but is distinct from, the broader right to record law enforcement activity in public. In any event, even under the concurring opinion's understanding of the relevant inquiry, the recording in this case captures "law enforcement activity." Specifically, it depicts police vehicles entering and leaving the station and traveling on adjacent streets. *See id.* at 3–4; *cf. United States v. Paxton*, 848 F.3d 803, 810 (7th Cir. 2017) (noting that six other circuits had concluded "that squad cars function both as a mobile office for a patrol officer and as a temporary jail for detainees in transport").

[5] Nothing in the record suggests that Massimino used technology to capture information that could not otherwise be observed from his lawful vantage point on the public sidewalk. We do not address a recording made through technology that reveals information not otherwise perceptible by ordinary observation from that location.

528 U.S. 32, 40 (1999)). The First Amendment protected Massimino's right to record and convey the information the government exposed to ordinary observation on the unrestricted public sidewalk. When the government wants to preserve its privacy, it may build a fence or close a door[6]—but not ban speech. *Cf. Fla. Star v. B.J.F.*, 491 U.S. 524, 534 (1989) ("Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts."); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101–06 (1979) (finding unconstitutional the indictment of newspapers for violating a statute that prohibited publishing the names of youth offenders without permission where the newspapers learned those names by listening to a police radio frequency); *Okla. Publ'g Co. v. Dist. Ct. in & for Okla. Cnty.*, 430 U.S. 308, 308–12 (1977) (striking down an order enjoining media from reporting the name or photograph of a minor in connection with a juvenile proceeding that the press had been allowed to attend).

[6] This too has limits. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011) (explaining that restrictions on access to non-public information in the government's possession "can facilitate or burden the expression of potential recipients and so transgress the First Amendment").

Benoit and Laone effectively concede this point. They admit that the government could not prohibit Massimino from verbally describing the very same purportedly "sensitive" and "non-public" areas that it prohibited him from recording. Their position is simply that Massimino had no right to convey this information *by video*. But the First Amendment permits no such distinctions. *See Burstyn*, 343 U.S. at 502.

In sum, the First Amendment right to record law enforcement activity in public encompasses the right to record publicly visible areas of a police station from a public sidewalk.[7] Of course, the right to record law enforcement activity is

---

[7] It is well-established that the government may, under certain circumstances, validly restrict the public's ability to record when they are on government property. *See, e.g.*, *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 20 (2d Cir. 1984) (holding CNN did not have a First Amendment right to produce a live broadcast of a trial); *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 113–14 (2d Cir. 1984) (finding no right to make audio recordings in a courtroom). But those decisions involved recording restrictions imposed within courtrooms. They do not address the government's authority to prohibit a person standing on a public sidewalk from recording what is exposed to ordinary observation from that location. Moreover, we do not decide whether the First Amendment necessarily protects the right to record the exterior of other types of government buildings, like, for instance, K-12 schools. Nor do we decide whether the government may impose a properly tailored restriction directed at recording particular persons entering or leaving a station, nonpublic security features, or other information implicating concrete privacy or safety interests. The officers here did not impose such a restriction; they told Massimino that recording the police station was prohibited altogether.

not limitless—it can be subject to reasonable time, place, and manner restrictions.[8] *See, e.g.*, *Alvarez*, 679 F.3d at 591–92, 604–08. But Benoit and Laone have not suggested that any such restriction is relevant here.[9]

**B. The Lack of a Clearly Established Right at the Time of the Conduct**

Although Benoit and Laone violated Massimino's First Amendment right to record the publicly visible areas of a police station from a public sidewalk, that right was not clearly established in this circuit "at the time of the challenged conduct." *Vullo*, 144 F.4th at 391. Benoit and Laone are therefore entitled to qualified immunity.

[8] "The characterization of a restriction as one of 'time, place, and manner' applies when the achievement of a significant governmental objective necessitates some imposition on a claimed right that is largely immaterial to the exercise of the right, whether that imposition occurs at one or another time or place, or in one or another relatively comparable manner." *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 73 (2d Cir. 2025). Time, place, and manner restrictions "are permissible if they '[1] are justified without reference to the content of the regulated speech, [2] . . . are narrowly tailored to serve a significant governmental interest, and [3] . . . leave open ample alternative channels for communication of the information.'" *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (alterations in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

[9] We do not suggest that Benoit and Laone were required to allow Massimino to continue recording if they had reason to believe he was engaged in or planning to commit some unlawful act, beyond the otherwise protected act of making the recording. And of course, speech integral to criminal conduct is not entitled to First Amendment protection. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). So Massimino would have no right to record for the purpose of planning a robbery of, or attack on, the police station. As discussed *infra*, officers are permitted to act on reasonable suspicion of criminal conduct. Here, however, the recording establishes that Benoit and Laone believed it was unlawful for Massimino to record the police station under any circumstances. They stated in no uncertain terms that he was not permitted to record the police station.

To determine whether a right was clearly established at the relevant time, we "look[] to whether (1) [the right] was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Id.* at 390 (quoting *Radwan v. Manuel*, 55 F.4th 101, 114 (2d Cir. 2022)). "Absent controlling authority from the Supreme Court or this Circuit, a plaintiff may still show that a right is clearly established if 'a robust consensus of cases of persuasive authority' says so." *Id.* (quoting *Radwan*, 55 F.4th at 114). Ultimately, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

At the time of Massimino's arrest, a robust consensus of our sister circuits had recognized a First Amendment right to record law enforcement activity in public, including one that considered the right to record the publicly visible areas of a police station. *See Turner*, 848 F.3d at 690. Despite our holding here that the First Amendment applies with equal force to that specific conduct, we do not think that conclusion would have been obvious to every reasonable officer in this circuit

in 2018. Although Massimino recorded some areas where the public could not *enter*, what matters for purposes of the right at issue is that those areas were *in public view*. A reasonable officer in Benoit and Laone's shoes may not have appreciated that distinction at the time of the incident, particularly in light of sensible safety concerns.

We conclude that Benoit and Laone are entitled to qualified immunity as to Massimino's First Amendment claim.

## II. Fourth Amendment

Massimino brings three separate claims under the Fourth Amendment and Connecticut law. These claims fail.

### A. *Terry* Stop

Massimino first alleges that he was subject to an unlawful investigative detention when Benoit and Laone stopped and questioned him. Not so.

Investigative detentions—often referred to as *Terry* stops[10]—"are lawful custodial interrogations that do not rise to the level of an arrest and are justified when an officer has 'reasonable suspicion to believe that criminal activity has

---

[10] *See Terry v. Ohio*, 392 U.S. 1 (1968).

occurred or is about to occur.'" *Soukaneh v. Andrzejewski*, 112 F.4th 107, 117 (2d Cir. 2024) (quoting *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995)). "'[R]easonable suspicion demands . . . less than is necessary for probable cause,' and 'is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts, . . . provide a particularized and objective basis for suspecting legal wrongdoing.'" *Id.* (alterations in original) (quoting *United States v. Patterson*, 25 F.4th 123, 135–36 (2d Cir. 2022)).

A *Terry* stop "must be 'justified at its inception,'" meaning that "[a]ny events that occur after a stop is effectuated cannot contribute to the analysis of whether there was a reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). We therefore begin by identifying the moment at which Massimino was subject to a seizure.

An individual has been subject to a "seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984)

(quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also United States v. Weaver*, 9 F.4th 129, 142 (2d Cir. 2021) (en banc) (same). The Supreme Court has also "framed the seizure inquiry as 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015) (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

We agree with the District Court that Massimino was subject to a seizure when Benoit and Laone "asserted that their demand for identification was 'a lawful order.'" *Massimino*, 2025 WL 975177, at *3. At that point, Massimino was no longer free to decline the request for identification. His refusal to provide identification was the basis for his arrest.

Massimino argues that the seizure took place the first time Benoit and Laone requested identification, before they clarified that he was required to comply. But it is well established that officers may request identification without effecting a seizure. *See United States v. Compton*, 830 F.3d 55, 65 (2d Cir. 2016) ("During a consensual encounter, 'officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identification. . . .'" (quoting *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996))); *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992) (finding that no seizure had occurred where an officer "alone approached [the individual] in a public place, identified himself as a police officer, and . . . asked whether [the individual] would consent to have his bags searched for narcotics"). We conclude that, before Benoit and Laone stated that their request for identification was "a lawful order," a reasonable person in Massimino's position would have felt free to terminate the interaction and walk away.

Thus, the operative question is whether Benoit and Laone's decision to detain Massimino was supported by reasonable suspicion the moment they framed their request for identification as "a lawful order."

We evaluate reasonable suspicion "through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training." *United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) (quoting *United States v. Wallace*, 937 F.3d 130, 138 (2d Cir. 2019)). "Contextual considerations, such as the fact that the stop occurred in a high crime area, factor into a reasonable-suspicion analysis, and the officers' assessment of an individual's nervous or evasive behavior is pertinent in establishing reasonable suspicion." *United States v. Hagood*, 78 F.4th 570, 576 (2d Cir. 2023) (quoting *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022)). And "[a]lthough any one of these factors, standing alone, might not support reasonable suspicion, we do not subject factors pertaining to an officer's reasonable suspicion to . . . a divide-and-conquer analysis." *Id.* (quoting *United States v. Santillan*, 902 F.3d 49, 58 (2d Cir. 2018)).

Still, we do not "merely defer to police officers' judgment." *Walker*, 965 F.3d at 186 (quoting *Wallace*, 937 F.3d at 138). Although "[a]n indication of possible illicit activity is properly informed by 'commonsense judgments and inferences about human behavior,'" reasonable suspicion "requires more than a 'hunch' to

justify an investigatory stop." *United States v. Singletary*, 798 F.3d 55, 59–60 (2d Cir. 2015) (first quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); then quoting *Terry*, 392 U.S. at 27).

To begin, the fact that Massimino was recording the police station, standing alone, is insufficient to furnish reasonable suspicion. A person may be videotaping the exterior of a building, even a police station, for any number of legitimate reasons: they might be pursuing an architectural interest, formulating political speech, or engaging in artistic expression (perhaps channeling Monet to record the building in different lights). At the same time, a person may be videotaping for illegitimate reasons: they might be creating a video recording to plan arson, robbery, or a bombing. Officers remain free to approach a person recording a building and ask questions or request identification. *See supra* at 25–26. Only when the person being questioned reasonably believes she is not free to leave does the Constitution require the stop to be supported by reasonable suspicion.

As noted, Massimino was so detained when Benoit and Laone characterized their request for identification as "a lawful order." At that point, the circumstances

under which Massimino was recording the police station—coupled with his evasive responses to Benoit and Laone's questions—were sufficient to justify a brief investigative detention. Massimino recorded the police station for an extended period of time, near dusk, and in a manner that could reasonably concern an officer worried about the safety and security of the station. Indeed, Benoit and Laone testified that, at the time, they were aware of recent attacks on other police stations.

These facts, together with Massimino's evasive demeanor in his interaction with Benoit and Laone, were enough to furnish reasonable suspicion. Therefore, Benoit and Laone's initial seizure of Massimino—prior to his arrest—did not violate the Fourth Amendment.

**B. Massimino's Arrest and Prosecution**

Benoit and Laone had probable cause to arrest Massimino.

Massimino was arrested for violating Conn. Gen. Stat. § 53a-167a, which makes it unlawful to "obstruct[], resist[], hinder[] or endanger[] any peace officer or firefighter in the performance of [his or her] duties." The Connecticut Supreme Court has explained that "a refusal to provide identifying information to a police

officer in connection with a legitimate *Terry* stop may be sufficient to constitute a violation of § 53a-167a." *State v. Aloi*, 911 A.2d 1086, 1097 n.22 (Conn. 2007). Because we conclude that Massimino was subject to a legitimate *Terry* stop, and all agree that Massimino refused to comply with Benoit and Laone's order to produce identification, it follows that the officers had probable cause to believe Massimino had violated § 53a-167a. *See Sacaza v. City of New York*, 169 F.4th 363, 370 (2d Cir. 2026) ("Law enforcement officers have probable cause to arrest when they have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022))).

This conclusion is fatal to Massimino's malicious prosecution claim. "Actual probable cause is a 'complete defense' to . . . malicious prosecution claims unless intervening facts discovered between the arrest and the initiation of prosecution dissipate probable cause." *Id.* (citation omitted) (quoting *Triolo*, 24 F.4th at 106). Massimino does not argue—nor could he—that circumstances changed between arrest and prosecution that dissipated probable cause. Because

Massimino's arrest was supported by probable cause, and that probable cause continued to exist at each stage of his prosecution, his malicious prosecution claim fails.

## CONCLUSION

We recognize the difficult and dangerous job that law enforcement officers are called to perform on a daily basis. In a democratic society, speech and scrutiny are not obstacles to performing that job. They are essential to it.

Still, Benoit and Laone are entitled to qualified immunity from liability for violating Massimino's First Amendment rights because the right to record the publicly visible areas of a police station from a public sidewalk was not clearly established at the time of Massimino's arrest. Further, because Massimino's detention, arrest, and prosecution all complied with applicable Fourth Amendment standards, Benoit and Laone are entitled to summary judgment as to those claims.

For the foregoing reasons, the judgment of the District Court is **AFFIRMED.**