REENA RAGGI, *Circuit Judge*, concurring:

I concur in the court's decision to uphold an award of summary judgment in favor of defendant police officers Matthew Benoit and Frank Laone. Specifically, I agree with my colleagues in the majority that, on plaintiff Keith Massimino's First Amendment claim, the officers are entitled to judgment on qualified immunity grounds because, at the time of their challenged action—*i.e.*, telling Massimino that it was unlawful for him to make any videorecording of the Waterbury, Connecticut police station—no right to film police station exteriors was clearly established. *See* Majority Op., *ante* at 21-23; *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). I further agree that the officers are entitled to judgment on Massimino's Fourth Amendment claim because, when they ordered him to produce identification, the officers had sufficient reasonable suspicion of unlawful activity to conduct an investigative stop. *See* Majority Op., *ante* at 23-29; *Terry v. Ohio*, 392 U.S. 1 (1968). Finally, I agree that the officers are entitled to judgment on Massimino's malicious prosecution claim because the challenged arrest and filing of charges were supported by probable cause. *See* Majority Op., *ante* at 29-31; *Sacaza v. City of New York*, 169 F.4th 363, 370 (2d Cir. 2026).

I write separately because, on the qualified immunity point, I think it unnecessary and inadvisable to go further in this particular case and to pronounce a First Amendment right to record any law enforcement activity occurring in public, *see* Majority Op., *ante* at 16, and any publicly visible areas of a police station from a public sidewalk, *see id., ante* at 20. I, therefore, respectfully decline to join in those parts of the majority opinion.

To explain my reservations, I begin by noting the two inquiries relevant to qualified immunity analysis: *first*, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right"; and *second*, whether such right was "clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. at 232 (internal quotation marks omitted). As the Supreme Court held in *Pearson*, courts are not required to address these inquiries sequentially; rather, they have the discretion to decide qualified immunity on the second ground without conclusively deciding the first. *See id.* at 236. That is what I would do here. Thus, to the extent Massimino alleges that the defendant officers told him that it was unlawful for him "to record the police station under *any* circumstances," *see* Majority Op., *ante* at 21 n.9 (emphasis added), I assume, without deciding, that such a categorical ban violates the First Amendment.[1] Nevertheless, I conclude that defendants are entitled to qualified immunity because no constitutional right to record police stations—whether generally or specifically—was then clearly established.

By contrast, my colleagues in the majority choose not only to start with the first inquiry noted in *Pearson*, but also to expand it to reach beyond the particular facts alleged by Massimino—*i.e.*, the officers' pronounced categorical ban on any videorecording of a police station—and to conclude that the First Amendment affords a broad right to record any "law enforcement activity in public," *see id.*, *ante* at 16, and any "publicly visible areas of a police station from a public sidewalk." *See id.*, *ante* at 20. No such broad pronouncements are necessary given the majority's statement that its "holding . . . is limited to the conduct and restriction presented here." *See id.*, *ante* at 9 n.2.

---

[1] As the majority observes, a person might record the exterior of a police station for a benign purpose, *e.g.*, the building's architectural or historic interest, or for a nefarious one, *e.g.*, to plan an arson, robbery, or bombing. *See id.*, *ante* at 28.

As the majority notes, this court has thus far declined to decide "whether the First Amendment protects a right to record law enforcement activity in public." *Id.*, *ante* at 10 (citing *Reyes v. City of New York*, 141 F.4th 55, 72 n.16 (2d Cir. 2025)). We should not attempt to do so in this case, which involves very little "activity" of any kind, much less "law enforcement activity."

Those courts of appeals that have recognized a right to record law enforcement activity have generally done so in cases where police were engaged in "public encounters" with civilians or some activity reasonably understood to be of "public interest." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 678 (4th Cir. 2023) (recognizing right to record in context of police traffic stop); *see, e.g.*, *Irizarry v. Yehia*, 38 F.4th 1282, 1285–86 (10th Cir. 2022) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 356 (3d Cir. 2017) (recognizing right to record in context of police arrest); *Glik v. Cunniffe*, 655 F.3d 78, 79–80 (1st Cir. 2011) (same); *Smith v. City of Cumming*, 212 F.3d 1332, 1332–33 (11th Cir. 2000) (recognizing right to record in context of traffic stop). That is not this case.

The overwhelming majority of the video recorded by Massimino depicts no police officers at all—that is, until Massimino is approached by the defendant officers. Rather, the focus of Massimino's video is on the exterior of the police station, which Massimino records as he travels round the building while occasionally lingering or zooming in on its main entrance; the side entrance to its "Youth Division" (not generally open to the public-at-large); a station rooftop security camera; and its semi-open garage, through which some police vehicles were visible.[2] To be sure, at one point, a person in civilian clothing is briefly

[2] The majority states that "[n]othing in the record suggests that Massimino used technology to capture information that could not otherwise be observed from his lawful vantage point on the public sidewalk." Majority Op., *ante* at 18 n.5. But Massimino appears to have been doing just that when he occasionally used his camera's zoom feature to obtain (and record) a better view of the station than was visible to his naked eye.

recorded standing outside the Waterbury station's main entrance. His identity and the reason for his presence are unclear. He does not appear then to be either engaged in, or the subject of, any law enforcement activity. At other points, three police vehicles are briefly recorded, one entering and one leaving the station garage, and one in street traffic.[3] While there may well be circumstances in which the movement of police cars reflects law enforcement activity, that is not obviously the case here. Indeed, Massimino focuses on these vehicles only briefly before panning away to continue recording the exterior of the building, where no activity of any kind is occurring.

In sum, in this case, where a plaintiff's recording focus was on a building, and not on "activity," there appears to be no reason for the court to pronounce a broad First Amendment right to record "law enforcement activity" occurring in public. *See generally Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in judgment) ("If it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more." (emphasis in original)).

The majority, however, appears to think that a First Amendment right to record law enforcement activity is appropriately recognized in this case as the foundation for a related right to record the exterior of a police building, even in

---

Perhaps that enhanced view—achievable through a common camera feature—is not what the majority has in mind when it states that the right to record recognized today does not necessarily reach "a recording made through technology that reveals information not otherwise perceptible by ordinary observation from that location." *Id.* But the potential need to determine when technologically enhanced visibility reveals information "not otherwise perceptible by ordinary observation from that location" only reinforces my reluctance in this case to pronounce a First Amendment right to record any part of a police station that is visible from a public street.

[3] The defendant officers do not appear to have told Massimino that he could not film police cars—though they may not have known he had done so. Thus, for purposes of this appeal I will assume that their pronounced prohibition on filming the police station also applied to police vehicles at the station.

the absence of any activity. The stated reasons for concluding that a right to record law enforcement activity supports a right to record police stations leave me with some doubts. I do not discuss these in detail. I note only, by example, that to the extent the majority locates support for a right to record law enforcement activity in precedent deeming it "essential" that people "have the ability to learn of, monitor, and respond to the actions of their representatives and their representative institutions," Majority Op., *ante* at 15 (quoting *United States v. Greenwood*, 145 F.4th 248, 254 (2d Cir. 2025) (quoting *United States v. Erie County*, 763 F.3d 235, 239 (2d Cir. 2014))),[4] it is not apparent that recording the exterior of a police station in the absence of any activity affords people any "ability to learn of, monitor, and respond to the actions of their representatives and their representative institutions."[5]

Insofar as the majority cites *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 594–96 (7th Cir. 2012), to support a conclusion that the right to make a recording is implicit in the right to publish or broadcast a recording, *see* Majority Op., *ante* at 12-13, the Seventh Circuit drew the analogy in recognizing a First Amendment right to audio record police communications occurring in public, particularly at public gatherings such as protests. The majority, however, appears to go further, recognizing a right to record whatever police activity (or inactivity) a person standing in a public street can see or hear from that location, even if what is being recorded is off the public street. *See id.*, *ante* at 17-21. Assuming that such

[4] Both *Greenwood* and *Erie County* state this principle in explaining why the public was there entitled to access certain existing court records. Neither case, however, addresses a person's right to create documents, much less videos.

[5] While one court has equated the filming of a police station with the filming of police activity in affording First Amendment protection to both, *see Turner v. Lieutenant Driver*, 848 F.3d 678, 687–90 (5th Cir. 2017), it offered little explanation for that equation.

a conclusion might be warranted in some circumstances, I hesitate to reach it categorically in this case.

As the New York Court of Appeals recently recognized in rejecting an asserted state statutory right to record inside publicly accessible police station lobbies, such recordings can raise privacy concerns—for crime victims, witnesses, confidential informants, undercover officers—adverse to responsible law enforcement. *See Reyes v. City of New York*, --- N.Y.3d ---, 2026 WL 1790855, at *5 (June 23, 2026)[6]. These concerns obtain as much when such persons are recorded as they are about to enter a police station as once they arrive inside the public lobby, and I am not yet convinced that the concerns are completely irrelevant to a First Amendment inquiry so long as the person recording is himself on a public street. Thus, better to decide the scope of any First Amendment right to record what one can see from a public street in the context of particular cases rather than to pronounce a broad right in a case such as this involving little activity and hardly any persons.[7]

In concluding otherwise, the majority observes that when the government "expose[s] [areas] to ordinary observation on the unrestricted public sidewalk," it effectively discloses such information. Majority Op., *ante* at 19. In considering how much weight that observation will bear in identifying a First Amendment right to record, I note that the government also allows members of the public to see and hear all sorts of information when it admits them into various government

---

[6] *See also Reyes v. City of New York*, No. 23-7640, 2026 WL 2263365 (2d Cir. Aug. 6, 2026) (vacating preliminary injunction granted on erroneous assumption state and local law afforded right to record interior areas of police station open to public).

[7] The majority appears to recognize the possible need for exceptions to the right to record it pronounces today by emphasizing that it does not here decide "whether the government may impose a properly tailored restriction directed at recording particular persons entering or leaving a station, nonpublic security features, or other information implicating concrete privacy or safety interests." Majority Op., *ante* at 20 n.7.

buildings, including courthouses. In that context, this court has not understood an ability to see and hear—and then to report what one has seen and heard—to equate to a right to record. *See, e.g.*, *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 21–24 (2d Cir. 1984) (holding First Amendment affords no right to produce live broadcast of public trial); *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 113–14 (2d Cir. 1984) (rejecting claim of First Amendment right to audio record trial). These cases signal some caution before concluding that anything the government allows the public to see—whether in the interior or exterior of a government building—it must also allow the public to record.

Indeed, even if this "disclosure" reasoning were limited to exterior parts of government buildings that can be seen from a public street, concerns arise about broad conclusions. For example, would that mean a person had a First Amendment right to record the entrances, exits, and security features not only of a police station but also of a public elementary school? The majority says it does not decide that question today. *See* Majority Op., *ante* at 20 n.7. But its recognition of a right to record information "in plain view," *id.* at 18, that "the government exposed to ordinary observation on the unrestricted public sidewalk," *id.* at 19, may be difficult to cabin to police stations. And even as to such buildings, might a different analysis be warranted if the defendant officers' recording ban here had not been categorical but had been limited to recording persons entering or departing the Youth Division?[8]

Thus, rather than reach any categorical conclusions in this case about a right to record law enforcement activity or the exterior of police stations, I simply assume that the defendant officers' pronounced categorical ban on *any* recording

---

[8] I do not foreclose the possibility of the First Amendment applying even to recordings made in the suggested contexts. But I prefer in this case not to make any broad pronouncements about a right to record that could dictate conclusions in circumstances not presented by this case and that could yield unanticipated consequences.

of the police station violated the First Amendment but, nevertheless, I join my colleagues in the majority in concluding that the officers are shielded by qualified immunity from Massimino's First Amendment claim because no right to record the exterior of police stations was then clearly established.